[Civ. No. 19193. First Dist., Div. One. Nov. 28, 1960.]

ALICE MASTEN SPENCER, as Administratrix with the Will Annexed, etc., Appellant, v. THE HIBERNIA BANK et al., Respondents.

[Civ. No. 19194. First Dist., Div. One. Nov. 28, 1960.]

ALICE MASTEN SPENCER et al., Appellants, v. THE HIBERNIA BANK et al., Respondents.

[Civ. No. 19195. First Dist., Div. One. Nov. 28, 1960.]

MARIAN MEL, as Special Administratrix, etc., Appellant, v. THE HIBERNIA BANK et al., Respondents.

706

M. Mitchell Bourquin and George Olshausen for Appellants.

Tobin & Tobin, Sullivan, Roche, Johnson & Farraher and Brobeck, Phleger & Harrison for Respondents.

TOBRINER, J.—If, as Judge Jerome Frank has written, each case is but an excursion into history,[1] we must view the litigation in its historical setting and in the context of the times in which it originated. Within those limitations we have examined the unique structure of the first Hibernia corporation of 1859 and the subsequent corporation of 1864 to determine if, in the posture of the instant cases, appellants establish valid claims to ownership of assets here. The task has necessarily been made more difficult by the long lapse of time since

---

[1] "Thus the trial court acts as an historian, its job being much the same as the historian's. The historian, too, tries to reconstruct the past, but usually he relies on second-hand or third-or-fourth-hand reports of dead witnesses. Indeed, the historian has been called a judge of the dead." (Jerome Frank, Courts on Trial, p. 37.)

the origin of the alleged rights. Our inquiry convinces us that in substance appellants' contentions succumb to the lack of depositorship of their predecessors in the 1859 and 1864 institutions and, in any event, to the nondescendibility of any alleged rights of such predecessors.

Appellants in these three declaratory relief actions seek as successors in interest of N. K. Masten and John Mel a determination of claimed rights in The Hibernia Bank. The trial court granted respondents' motions for summary judgments and appellants have appealed from the ensuing judgments.

This appeal presents five issues for our determination:[2] (1) the applicability of a summary judgment in a declaratory relief action; (2) the alleged presence of factual issues; (3) the effect of respondents' affidavits upon the first count of the second amended complaint; (4) the rights of appellants' predecessors in the 1859 Hibernia corporation and the 1864 Hibernia corporation in the absence of depositorship; and (5) the descendibility of the rights of appellants' predecessors.

The principles which apply to the summary judgment procedure are well settled. In considering such a motion the trial court merely ascertains the presence or absence of factual issues (*Walsh* v. *Walsh* (1941), 18 Cal.2d 439, 441 [116 P.2d 62]); it does not decide the nature or the truth of the facts themselves. (*California Lettuce Growers* v. *Union Sugar Co.* (1955), 45 Cal.2d 474, 488 [289 P.2d 785, 49 A.L.R. 2d 496].) If no triable issues of fact exist and the movant's affidavits would sustain a judgment in his favor, the court will grant the motion. (*Desny* v. *Wilder* (1956), 46 Cal. 2d 715, 725-726 [299 P.2d 257]; *Coyne* v. *Krempels* (1950), 36 Cal.2d 257, 260-261 [223 P.2d 244].) However, since this determination must be based upon affidavits without the benefit of cross-examination or trial by jury, the affidavits of the moving party are strictly interpreted while those of the opponent are liberally construed; in this respect the opponent's affidavits need not be composed wholly of evidentiary facts. (*Eagle Oil & Refining Co.* v. *Prentice* (1942), 19 Cal.2d 553, 556 [122 P.2d 264].) "In other words, the affidavits are to be construed with all intendments in favor of the party opposing the motion . . . ." (*Desny* v. *Wilder, supra,* 46 Cal.2d 715, 726.)

---

[2] A sixth issue, whether appellants are barred by the in rem judgment in 1946 which purported to determine the members of The Hibernia Savings and Loan Society, we do not discuss since our determination of the other issues renders this question moot.

Applying these rules, we present a summarization of the basic history of The Hibernia Bank, beginning with the formation of a singular corporation that, although structured as a capital stock corporation, was in essence a mutual savings bank, and the subsequent change to a membership corporation. We discuss other facts involving other issues when we analyze the materiality of those issues.

On February 2, 1859, a "few Irish gentlemen" met in San Francisco "for the purpose of taking into consideration the necessity of immediately organizing 'a Savings Bank' chiefly for the benefit of our own people . . . ." Subsequent to the election of a chairman, and in response to his request, William MacCann explained the objectives of the meeting; in so doing he "urged the necessity of adopting some plan by which the thousands of Irish, residing in this country might have some secure place of deposit for their savings . . . ." At this meeting eight "Provisional Trustees" were appointed and it was resolved: "[T]he signing of the Preamble[3] to the constitution and the payment of five dollars, shall be the terms of membership, and such shall have a vote until the society shall be fully organized"; and, Mr. R. Tobin shall record the existence of the society in conformity with the laws of the state.

On the 3d and 8th of March, 1859, John Mel and N. K. Masten, respectively, signed the preamble and paid the $5.00. At a meeting on March 24, 1859, "Mr. Masten introduced for discussion the need of having the Society duly *incorporated* in conformity with the laws of the State" and the body appointed a committee for that purpose.

The founders of The Hibernia Savings and Loan Society incorporated it under an 1853 act (Stats. 1853, p. 87); they executed its certificate of incorporation on the 31st of March and filed it with the county clerk on April 12, 1859. The certificate of incorporation provided that the "Capital Stock shall be Six Hundred Thousand Dollars, and the number of shares of which said stock shall consist, shall be Six Thou-

---

[3] "We, the undersigned being desirous of forming a Society by means of which its members may be enabled to find a secure and profitable investment for small savings, and from which they may have an opportunity to obtain the use of a moderate capital on giving good and sufficient security for the repayment of the same with interest, etc. whether such capital is to be used in the prosecution of commercial business, in purchasing a homestead or for other lawful purposes, do, each for himself covenant promise and agree to and with all the other subscribers hereto, that a constitution shall be drawn up for our government and which shall determine our mutual duties, rights and privileges as members of such Society.

[Signatures omitted] "

sand . . . ." This corporation, hereinafter denominated "Hibernia of 1859," adopted by-laws; pursuant to the preamble, the undersigned, among whom were N. K. Masten and John Mel, agreed that these by-laws "shall govern us, and determine our mutual duties, rights and privileges, as members of such Society."

Article 5 of these by-laws recited "Those who shall sign these By-Laws . . . and pay the entrance fee of two dollars, shall be styled and considered members of this Corporation. Those, who, in addition to the above, shall hold one or more shares of its Stock shall further be styled and considered Stockholders . . . . The entrance fee will in no case be repaid or credited back, but shall be considered part of the sinking fund . . . ." Article 21 further provided that " [m]embers shall be at liberty to make deposits in sums of not less than two and one-half dollars," and article 24 recited "All deposits withdrawn at any time before the declaration of the dividend for the current half year, shall be entitled to interest at the rate of one-half of one per cent, per month . . . ." The by-laws concluded with article 38 : " [N]o alteration of any of . . . these By-Laws shall be made, except by a vote of three-fourths of all the shares which may be represented at the meeting of the Society at which it may be voted upon . . . ."

The incorporators of Hibernia of 1859 planned that the members were to compose the owners, proprietors, and constituents of the corporation. No dividends were ever declared or paid upon the outstanding stock of this corporation; rather, all dividends were paid to the members upon their deposits. Though incorporated as a stock corporation, Hibernia of 1859 issued stock only during the period June 14, 1859, to November 29, 1861, and by June 27, 1863, all but four certificates, whose whereabouts were unknown, had been retired and cancelled. Thereafter, the corporation consisted of members only. And, though only twenty persons signed this Hibernia certificate of incorporation, some 5,479 persons by August 29, 1864, became members of this Hibernia.

Both Masten and apparently Mel paid the two-dollar entrance fee, signed the by-laws, and made deposits in Hibernia of 1859. Masten withdrew his original deposit, making subsequent deposits and withdrawals from time to time thereafter, but on July 27, 1864, he withdrew his entire balance, closed his account and never again became a depositor. By December 1, 1861, Mel withdrew his deposit and likewise never again became a depositor.

On August 29, 1864, the board of trustees, in accordance with the membership's authorization, elected to incorporate under "An Act to provide for the Formation of Corporations for the Accumulation and Investment of Funds and Savings." (Stats. 1862, p. 199, as amended by Stats. 1864, p. 531.) And on August 30, 1864, they filed a new certificate of incorporation, which, pursuant to section 2 of the act, limited the corporate existence to 50 years. The act permitted all savings and loan societies, claiming in good faith to be incorporated under the laws of this state, to incorporate as savings banks without capital stock; it further provided that the corporate powers be exercised by a board of directors. Among other corporate powers the act included the authority "To make by-laws . . . for the organization of the company . . . the regulation of its affairs . . . and the time and manner in which any person may become, or may cease to be, a member of the corporation . . . ." (Stats. 1862, p. 200.)

The certificate of this Hibernia Savings and Loan Society, hereinafter called "Hibernia of 1864," provided for a non-stock membership corporation. Hibernia of 1864 acquired all the deposits and properties of the 1859 corporation including the two-dollar entrance fees. Hibernia of 1864 operated under the 1859 by-laws until September 29, 1864, when the board of directors, without any vote by the membership, repealed the prior by-laws, and adopted new by-laws.

These new by-laws provided: "Art. 4th. All persons who were members of The Hibernia Savings and Loan Society on the twenty-ninth day of August, 1864,[4] shall be deemed and considered members of this corporation, and the signatures of such persons to an agreement on their part to become members of this corporation, and ratifying and confirming the incorporation of said The Hibernia Savings and Loan Society, as directed by a resolution of its Board of Trustees, adopted August 8th, 1864, shall be procured as speedily as may be . . . . Other persons may be allowed to become members of this corporation by a vote of the Board of Directors, and not otherwise. Membership shall not pass with the ownership of moneys deposited with or under control of the corporation . . . . Article 15th . . . Each depositor and new member shall pay an entrance fee of $2. which can never be claimed. All Entrance Fees shall go to the credit of the Reserve Fund."

[4] Respondents' version of this by-law is identical, except that August 31, 1864, is alleged rather than August 29; the difference is immaterial in the instant disputes.

Neither John Mel nor N. K. Masten ever became depositors of Hibernia of 1864; neither ever were voted members of this Hibernia by its board of directors; neither signed the ''Agreement to Become Members.'' John Mel and N. K. Masten died in 1892 and 1901, respectively.

On March 20, 1865, the board of trustees adopted the following by-law: ''[A]ll members of this corporation whose accounts have heretofore been closed, shall be allowed to deposit hereafter only upon the same terms and conditions as depositors who were never members of this corporation.''

In January, 1909, Hibernia of 1864 filed certain documents which purported to extend its corporate existence for another 50 years; and, in March 1934, Hibernia filed other documents purportedly providing for its perpetual existence under section 362c of the Civil Code. None of the appellants nor their predecessors executed any of these documents.

In 1947 Hibernia reorganized as a stock corporation under the name of The Hibernia Bank. The reserve fund of some $7,000,000, which had accumulated since Hibernia's 1859 incorporation, became the basis for a stock issuance to the individual respondents in the present case. (*Bennett* v. *Hibernia Bank* (1956), 47 Cal.2d 540 [305 P.2d 20].)

The trial court granted respondents' motions for summary judgments. Subsequent to the recitation ''the Court does hereby DECLARE the rights of the parties,'' the judgments provide: None of the plaintiffs have any interest in The Hibernia Bank, its assets or capital stock; N. K. Masten ceased to be a depositor of Hibernia in July, 1864; he was never thereafter a depositor, and was not a member thereof on August 29, 1864, or August 31, 1864; nor did Masten ever become a member of Hibernia of 1864. John Mel ceased to be a depositor of Hibernia in 1861, was not a depositor subsequently, and was not a member thereof on August 29, 1864, or August 31, 1864; nor did he become a member of Hibernia of 1864. Membership in both Hibernia of 1859 and 1864 was not transferable or descendible and therefore any interest which Masten or Mel may have had terminated with their death. No person acquired any rights or interest in The Hibernia Bank by virtue of having been an incorporator of Hibernia of 1859, or by having been a party to the preincorporation agreement entitled ''Preamble.''

We consider the subjects presented by appellants' allegations of error in the order listed.

1. *The applicability of a summary judgment in a declaratory relief action.*

Appellants' contention that the summary judgment procedure of section 437c (Code Civ. Proc.) does not apply to declaratory relief actions (Code Civ. Proc., § 1060) collapses when exposed to the rationale of that section and the form of the instant judgments.

Section 437c undertakes the expedition of litigation by the elimination of needless trials (*Cone* v. *Union Oil Co.* (1954), 129 Cal.App.2d 558, 562 [277 P.2d 464]; *Estate of Kelly* (1960), 178 Cal.App.2d 24, 28 [2 Cal.Rptr. 634]). It expressly applies to "all types of proceedings"; this section obviously "was intended to include declaratory relief actions in a proper case." (*Walker* v. *Munro* (1960), 178 Cal.App.2d 67, 70 [2 Cal.Rptr. 737].) The propriety of the application of declaratory relief lies in the trial court's function to render such a judgment when only legal issues are presented for its determination. (*Bank of America etc. Assn.* v. *Casady* (1936), 15 Cal.App.2d 163, 168 [59 P.2d 444]; *Enos* v. *Foster* (1957), 155 Cal.App.2d 152, 157 [317 P.2d 670]; *Doyle* v. *Hibernia Bank* (1957), 156 Cal.App.2d 16, 20 [319 P.2d 412].)

The judgments in the instant cases comport with the requirement of *Essick* v. *City of Los Angeles* (1950), 34 Cal.2d 614, 624-625 [213 P.2d 492], that, in a declaratory relief action, the court should decree that "plaintiffs are not entitled to the declarations in their favor" rather than enter a judgment of dismissal. (P. 624.) Appellants' claim, therefore, that the application of section 437c to declaratory relief actions is tantamount to a repeal of this latter section, because it prevents a declaration of the parties' rights, cannot stand.

2. *The alleged presence of factual issues.*

Appellants assert the existence of two triable factual issues: the first, as to an alleged partnership of Masten, Mel, and others; the second, as to an alleged discriminatory descendibility of membership to those of the Tobin family. With respect to the first, appellants submit that a factual dispute arises from their contention, on the one hand, that, prior to the 1859 incorporation,[5] Masten, Mel and eighteen other per-

---

[5] "[O]n . . . February 2, 1859 . . . Masten . . . Mel . . . [and others] agreed orally, . . . and on or about February 10, 1859, said persons . . . in writing . . . agreed that they should be associated . . . as equal partners to conduct a banking business . . . and . . . each of

sons formed a partnership and respondents' position, on the other hand, that these parties engaged in only preincorporation organizational meetings. But the proposed triable, factual issue must be material (*Pianka* v. *State* (1956), 46 Cal.2d 208, 212 [293 P.2d 458]); here, appellants' contention does not proffer a material issue.

■ Appellants' asserted partnership rights, even if established as factual, cannot survive the general proposition that "[u]pon the incorporation of a partnership and its merger in the corporate entity, the partners cease to be such, and have only the rights, duties and obligations of stockholders," (8 Fletcher, Cyc. of Corps., § 4018, p. 417), or, when a partnership is merged in a nonstock corporation, they acquire the rights, duties and obligations incident to membership in the particular type of organization involved. In the instant case appellants assert that Masten, Mel and eighteen other persons "became and continued to be, until April 12, 1859, the date of incorporation . . . equal partners in the banking business . . . . That on . . . said 12th day of April 1859, said partners executed the certificate of incorporation . . . and incorporated said banking business . . . adopted a code of by-laws and rules of order, and covenanted, promised and agreed that said by-laws and rules of order . . . should determine their mutual duties, rights and privileges as members of said corporation; . . . that each of said [former] partners . . . became a member of said corporation . . . ." Thus, appellants admit that their alleged rights depend upon their predecessors' status as members of Hibernia of 1859; accordingly, the existence of any preincorporation partnership becomes immaterial.

Appellants' cases do not compel a contrary conclusion: *Chater* v. *San Francisco Sugar Refining Co.* (1861), 19 Cal. 219, 246-247; *Shorb* v. *Beaudry* (1880), 56 Cal. 446, 450; *Hunt* v. *Davis* (1901), 135 Cal. 31, 34 [66 P. 957]; and *Baldwin* v. *Miller & Lux* (1907), 152 Cal. 454, 457 [92 P. 1030], involved preincorporation agreements among all those parties who were to comprise the corporation, and who, upon the formation of the corporation pursuant to the agreements, either technically or in essence were to become the stockholders. Ruling on such facts, the courts in each of these cases effectuated the preincorporation contract upon the theory that the

---

said persons then and there became and continued to be, until April 12, 1859, the date of incorporation, . . . equal partners . . .; that said persons . . . conducted a banking business as equal partners until April 12, 1859."

corporation, essentially a trustee, served as a mere agent to execute the terms of the contract. But appellants' predecessors here signed by-laws which were to ''determine their duties, rights and privileges''; the corporation served not as the executor of old rights but as the source of new relationships.

Nor is *Elsbach* v. *Mulligan* (1943), 58 Cal.App.2d 354 [136 P.2d 651], in point. In that case the plaintiff and defendant were the equal, and only, stockholders of a corporation which the trial court, upon sufficient evidence, found to have been organized by the parties to continue their joint venture. In allowing the plaintiff to recover individually for wrongs done by the defendant to the corporation, this court stated: ''Appellant contends that an individual stockholder has no . . . legal right to sue upon wrongs done the corporation. This argument is based primarily upon the contention that since plaintiff participated in the formation of the corporation he may not now proceed in disregard of the corporate entity, since when a corporation supersedes a partnership . . . rights subsequently accruing to the partners . . . are not based on that relationship. *The soundness of the contention generally may be admitted but there are exceptions to the general rule.* If a corporation or a formal partnership is a mere agency for the purpose of convenience in carrying out a joint venture agreement, and independent and innocent third parties such as creditors or stockholders, are not injured thereby . . . justice would seem to demand that in determining the rights of the parties they be placed in the position each occupied under the original agreement.'' (Pp. 368-369; emphasis added.)

*Strong* v. *Los Nietos etc. Assn.* (1902), 137 Cal. 607 [70 P. 734], likewise does not meet the issue. In that case the directors and all but four of the plaintiffs of an unincorporated association attempted to dissolve the association by forming a corporation which took over all the property of the association. The four old, as well as the four new, members of the old association, sued for a return of all the property upon the theory that the other persons had withdrawn from the association. The trial court gave judgment for defendants. In affirming the denial of the motion for new trial, no appeal being taken from the judgment, the Supreme Court stated that ''If plaintiffs were to get what they are asking for, . . . the defendants would have no further interest or property in the old association, and would be entirely excluded therefrom.'' (P. 609.) The court affirmed the trial court's finding that the members did not withdraw from the association by reason of

the incorporation; "If they are still members of the old association, whether it be a firm, partnership, or just a plain joint association, they cannot be deprived of their rights in the property thereof." (P. 610.) In the instant case appellants' own assertions reveal no retention of rights in the partnership, but discontinuance of the partnership beyond April 12, 1859, and agreement by the "former partners" to become members of, and to be governed by, the by-laws of the corporation.

We conclude that appellants' first proposed triable issue of fact founders on the rock of materiality.

■■ Appellants' second contention as to a triable issue of fact, premised upon the charge that membership was permitted in discriminatory fashion to descend to members of the Tobin family, fails in the absence of any showing of fact to sustain it.

Although section 437c requires that the affidavits set forth allegations of fact, appellants' affidavit and interrogatory, instead, disclose an absence of facts proffered by appellants. The affidavit states: "One of the issues which plaintiffs . . . *intend* to present, is the issue that subsequent provisions purporting to make membership non-descendable do not constitute the actual contract among the parties but that membership has always in fact been treated as descendable and memberships have in fact descended from generation to generation within the Tobin family and provisions for alleged non-descendability have been applied occasionally and only to eliminate descendants of members who did not belong to the Tobin family. The additional interrogatory posed calls for evidence upon this issue." While respondents answered the first part of the interrogatory relating to "the names of all the members of Hibernia . . . from August 29, 1864 to the present time," they did not respond to the following query: "[S]tate the relation by blood and/or marriage of each of said members to one another." Appellants took no appropriate action in the trial court to obtain this information.

The affidavit discloses that the affiant does not know the facts therein alleged; it states that affiant *intends* to present the stated issue. Such assertion of a future issue or proof has been characterized by *Nini* v. *Culberg* (1960), 183 Cal.App. 2d 657, 662 [7 Cal.Rptr. 146]: "The affidavit . . . merely states that during the trial it *may* be established that the instructions given by defendant *may* prove to be more detailed than as stated by defendant. If such a statement causes to arise an issuable question of fact, then there never could be

a summary judgment granted, for all a defendant would have to do when confronted by a motion for summary judgment would be to state in his counteraffidavit that at the trial facts might be produced which might contradict the definite statement of facts in the moving party's affidavit.''

 In this respect appellants assert that the trial court's refusal to receive into evidence, or even mark for identification, Hibernia's records for the past one hundred years invokes the rule that if evidence has been wrongfully excluded it must be presumed to be favorable to the offering party. Appellants' strongest citation on this point *Zainudin* v. *Meizel* (1953), 119 Cal.App.2d 265, 270 [259 P.2d 460], states ''that when a party has prevented proof of a fact by his *erroneous* objection and an *erroneous* ruling of the trial court, he will not be permitted to take advantage of his own wrong in the reviewing court but the latter court will assume that the fact was duly proved.'' (Emphasis added.)

In our case, respondents, not erroneously, but properly, objected to the introduction of all of their records, and the trial court correctly, not erroneously, excluded them. While a party opposing a motion for summary judgment, may, to obtain desired documents, utilize a subpoena duces tecum premised on an affidavit purporting to summarize documents within the movant's possession (*Whaley* v. *Fowler* (1957), 152 Cal.App.2d 379, 382-383 [313 P.2d 97] ;[6] *Schessler* v. *Keck* (1956), 138 Cal.App.2d 663, 669-670 [292 P.2d 314] ; Code Civ. Proc., § 1938), he may not use a subpoena duces tecum to adduce all of the movant's records regardless of their materiality. The provision of section 1985 of the Code of Civil Procedure, stating: ''The process by which the attendance of a witness is required . . . may also require him to bring with him any books, documents, or other things under his control which he is bound by law to produce in evidence'' has been interpreted to require the additional showing that the matters sought would be competent evidence

---

[6] ''The affidavit of plaintiff's attorney states . . . that he has studied the hospital records and charts of . . . defendant hospital . . .; that an infection developed in plaintiff's left leg while he was a patient at the hospital; that said infection was uncontrolled; that the facts established by the hospital records and Fowler deposition disclose that the hospital is jointly negligent with defendant Fowler.

''Obviously, this affidavit states no facts, merely hearsay and conclusions of law. Neither the hospital records nor the deposition of defendant Fowler was before the court. Said affidavit is of no value in determining whether there were issuable questions of *fact* . . . .''

and admissible at the trial. (Witkin, California Evidence, § 543, p. 591.)

■■■ Appellants' twofold argument that the records constituted competent evidence does not accord with rules of procedure germane to this kind of action. Appellants first contend that upon a hearing of a motion for summary judgment an affiant may be called as a witness and questioned as to the basis of his averments in the manner appellants attempted to follow in the instant case. On oral argument appellants asserted that ''Cross-examination is one form of raising an issue of fact.'' Section 437c indicates, however, that the hearing is to be premised upon affidavits; not only has the calling of a witness upon such a hearing been characterized as ''contrary to normal procedure,'' (*Gardner* v. *Shreve* (1949), 89 Cal.App.2d 804, 809 [202 P.2d 322]), but also in *Eagle Oil & Refining Co.* v. *Prentice, supra,* 19 Cal.2d 553, 556, the Supreme Court stated: ''Because the procedure is summary and presented on affidavits *without* the benefit of cross-examination, a trial by jury and opportunity to observe the demeanor of witnesses . . . the affidavits . . . [of the opponent] should be liberally construed . . . .'' (Emphasis added.)

■■■ Appellants' second ground rests on the theory that the opponent of a motion for summary judgment may introduce any and all of the movant's records whenever it appears that *some* record *might* contain *some* evidence favorable to the opponent; they state: ''Documents *in the possession of the opponents* are analogous to the examination of a party opponent under C.C.P. 2055. The Supreme Court has said that such an examination is exploratory, and the examiner *need not be able to say what he expects to produce.*'' As we have pointed out, the decisions sanction no such procedure. That the proceeding is a summary one does not warrant the adduction of a mass of documentary evidence embracing material and data unknown even to the offering counsel.

The evidence was, therefore, not admissible and respondents did properly object to its introduction. ■■■ Though initially a party may move to quash a defective subpoena duces tecum, he may also comply with it, and, when the evidence is produced in court, object to its admissibility. (Witkin, California Evidence, § 555, p. 603; *Southern Pacific Co.* v. *Superior Court* (1940), 15 Cal.2d 206, 209-210 [100 P.2d 302, 130 A.L.R. 323].) In the instant case respondents' objection, although not couched in formal language, related to the introduction of *all* of their records: ''Then there is a humdinger . . . . That

is all the records of the bank from 1859, one hundred years of records." As the court said in *Oxford Paper Co. v. United States* (1932), 56 F.2d 895, 896, "the practice of dumping upon the court a large number of documents or instruments in which very little is even claimed to be material or competent, without any statement as to the part thereof which it is claimed should be received in evidence, is disapproved, and marking a collection of different instruments as an exhibit to be used in this manner merely leads to the confusion which exists in the case ...."

The second triable issue of fact does not then materialize because it does not stand upon proffered proof of fact.

3. *The effect of respondents' affidavits upon the first count of the second amended complaint.*

Appellants vainly claim that the first count of the second amended complaint is not defeated by respondents' affidavits. First, as previously indicated, the partnership allegation of that count is immaterial. Second, this count fails in the void of its silence upon any reorganization of Hibernia subsequent to the 1859 incorporation; appellants themselves assert the 1864 incorporation was undertaken pursuant to the members' authorization and certain acts of the Legislature. (*Castleman v. Wright* (1948), 334 Ill.App. 74 [78 N.E.2d 341], ("motion for summary judgment was properly denied, where affidavits in support of motion set out several mutually contradictory statements of alleged facts").) Indeed, appellants' briefs offer no argument based upon this second point.

4. *The rights of appellants' predecessors in the 1859 Hibernia corporation and in the 1864 Hibernia corporation in the absence of depositorship.*

The first major substantive question before us turns on whether Mel and Masten could obtain membership in Hibernia of 1864 in the absence of any deposit in the bank on August 29, 1864. As we have pointed out, Masten withdrew his entire balance on July 27, 1864, and Mel withdrew his deposit by December 1, 1861. As of the 29th day of August 1864, neither were depositors. Article 4 of the by-laws of 1864 provided that "[a]ll persons who were members of The Hibernia Savings and Loan Society on the twenty-ninth day of August, 1864, shall be deemed and considered members of this corporation ...." Since the by-laws specify that membership must have existed as of the 29th day of August 1864, our question narrows to whether Masten and Mel can be regarded as

members on that day despite their lack of depositorship. We must determine the validity of the trial court's ruling that membership depended upon such depositorship.

Since appellants consistently assert that Hibernia of 1859 constituted a mutual savings bank,[7] we examine *seriatim* the relationship of deposit to membership in such a bank, the applicability of our ruling in *Doyle* v. *Hibernia Bank, supra,* 156 Cal.App.2d 16, and the contentions of appellants.

Savings banks originated in Great Britain as philanthropic institutions designed for the encouragement of savings by the working class (Horne, A History of Savings Banks (1947), pp. 1-70; 13 Holdsworth, History of English Law (1952), pp. 333-335; 2 Keyes, History of Savings Banks in the U.S. (1878), pp. 519-524), and were the progenitors of many similar institutions that later developed in the United States. (2 Keyes, History of Savings Banks in the U.S., *supra,* pp. 519-524; Kniffin, The Savings Bank and Its Practical Work (1928), pp. 5-19, 123-131.)

The legislative history of the mutual savings banks of England and Ireland indicates that depositorship in the bank was prerequisite to membership and that upon withdrawal of the deposit the member was entitled to no more than its return, plus interest. In its first regulation of these banks, Parliament, enacting two almost identical statutes (57 Geo. III, ch. 105, 57 Stats. at Large, p. 395 (Ireland); 57 Geo. III, ch. 130, 57 Stats. at Large, p. 495 (England)) provided that the trustees or managers of such a bank were to derive no benefit from deposits, but that the "Persons depositing Money therein shall have the sole Benefit of such Deposits and the Produce thereof . . . ." (57 Geo. III, ch. 105, § III, 57 Stats. at Large, p. 396; 57 Geo. III, ch. 130, § III, 57 Stats. at Large, p. 496.) Although silent in regard to any surplus fund of the savings banks, these statutes provided that in the event of the depositor's death, the bank should pay to his heirs or estate no more than the deposit with "any Dividends or Interest due thereon."[8]

---

[7] "Members" is "a generic term including everyone having an interest in the corporation, according to the law of mutual savings banks. . . ."

Respondents concede that Masten and Mel were members respectively until July 27, 1864, and December 1861.

[8] 57 Geo. III, ch. 105, §§ XXV and XXVI, and 57 Geo. III, ch. 130, §§ XXIII and XXIV are almost identical; the latter two sections provide: Section XXIII. "[I]n case any Depositor . . . shall die, leaving any Sum or Sums of Money in the said Funds, or any Dividends or Interest due thereon, belonging to him or her at the time of . . . Death,

Parliament's enactment on July 28, 1828 of "An Act to consolidate and amend the Laws relating to Savings Banks" (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 585) more clearly discloses that depositorship is the essence of membership in a mutual or trustee savings bank; that the depositor who withdraws his money is entitled only to the return of the deposit, plus interest or dividend, which includes no part of the bank's surplus. Of necessity the withdrawal involves a surrender of any interest in such surplus. The statute repealed prior laws relating to savings banks and consolidated in its provisions as one act the laws applicable to savings banks in both England and Ireland.

This 1828 statute was enacted for the benefit of societies in *England and Ireland* "maintaining any Institution in the Nature of a Bank to receive Deposits of Money *for the Benefit of the Persons depositing the same,* to accumulate the Produce or so much thereof as shall not be required by the Depositors, their Executors or Administrators . . . and to return the Whole or any Part of such Deposit and the Produce thereof to the Depositors, their Executors or Administrators (deducting out of such Produce so much as shall be required for the necessary Expenses attending the Management of such Institution) but [the persons forming such society] deriving no Benefit whatsoever from any such Deposit or the Produce thereof . . . ." (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 585; emphasis added.) This statute provided that the bank's trustees were to invest the monies received "in the Bank of *England* or the Bank of *Ireland,* as the Case may require, in the Names of the Commissioners for the Reduction of the National Debt" (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 590), and that these commissioners were also to hold the surplus fund of the bank.[9] The statute

exceeding . . . Twenty Pounds, the same shall . . . be paid . . . upon Probate of the Will of the deceased Depositor, or Letters of Administration of his or her Estate and Effects. . . ."

Section XXIV. If "any Depositor in the Funds of any such Institution shall die, leaving a Sum of Money in the said Fund, which, with the Interest thereon, shall not exceed . . . Twenty Pounds, . . . the Trustees or Managers . . . are . . . required, if no Will shall be proved, or no Letters of Administration shall be taken out, . . . to pay the same according to the Rules and Regulations of the said Institution . . .; and in the Event of there being no Rules and Regulations . . . among the . . . Persons entitled . . . according to the Statute of Distributions." (57 Geo. III, ch. 130, 57 Stats. at Large, p. 503.)

[9] "XXIII . . . in all Cases where the Joint Stock or Property of any Savings Bank . . . shall . . . be increased by the Interest received beyond the Rate of Interest payable to the Depositors . . . the said Trustees or Managers, after deducting all such Expenses as they may deem proper, shall, within Six Months after the Twentieth Day of

also provided that in the event of a depositor's death the depositor's estate or heirs were entitled to the deposit plus interest;[10] no provision was made for the estate or heirs to retain any interest in the surplus fund. These sections remained in force through 1859, although the statute was amended in other respects periodically.[11]

We believe that it is apparent from the provisions of this act that withdrawal of the deposit effectuated a surrender of any interest of the depositor in the surplus fund. Our conclusion finds corroboration in the purpose for which these banks were founded, the dependence of such an institution for its very life upon monies being deposited in it, and the pro-

---

*November* in each Year, ascertain, certify, and pay over to the said Commissioners the Amount of such increased Stock and Property, reserving such Portion as may appear necessary to meet current Expences; and the Amount of such Surplus . . . [may be] . . . claim[ed] and receive[d] of and from the said Commissioners . . . for the Purposes of the Institution. . . .'' (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 596.)

[10]''XL . . . in case any Depositor in the Funds of any Institution . . . shall die, leaving any Sum or Sums of Money in the said Funds, or any Dividends or Interest Due thereon, belonging to him or her at the Time of . . . Death, exceeding in the whole the Sum of *Fifty Pounds*, the same shall . . . be paid . . . upon the Probate of the Will . . . or Letters of Administration of his or her Estate and Effects. . . .'' (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 601.)

''XLI . . . in case any Depositor in the Funds of any such Institution shall die, leaving a Sum of Money in the said Fund, which, with the Interest thereon, shall not exceed in the whole Fifty Pounds, it shall be lawful . . . in case such Trustees or Managers shall be satisfied that no Will was . . . left, . . . and that no Letters of Administration will be taken out . . . to pay the same at any Time after the Decease of such Depositor, according to the Rules and Regulations of the said Institution; and in the Event of there being no Rules and Regulations . . . to pay and divide the same to and amongst the Person or Persons entitled to the Effects of the deceased Intestate, according to the Statute of Distributions.'' (9 Geo. IV, ch. 92, 68 Stats. at Large, p. 602.)

[11](1833) 3 & 4 Will. IV, ch. 14, 73 Statutes at Large, page 50, [enabling depositors to purchase government annuities through savings banks]; (1835) 5 & 6 Will., ch. 57, 75 Statutes at Large, page 270, [extending to Scotland the provisions of 9 Geo. IV, ch. 92 and 3 & 4 Will. IV, ch. 14]; (1844) 7 & 8 Vict., ch. 83, 84 Statutes at Large, page 358, [amending the provisions relating to the purchase of government annuities through savings banks]; (1848) 11 & 12 Vict., ch. 133, 88 Statutes at Large, page 886, [amending 7 & 8 Vict., ch. 83]; (1850) 13 & 14 Vict., ch. 110, 90 Statutes at Large, page 793, [continuing in force 11 & 12 Vict., ch. 133]; (1852) 15 & 16 Vict., ch. 60, 92 Statutes at Large, page 216, [continuing 11 & 12 Vict., ch. 133]; (1853) 16 & 17 Vict., ch. 45, 93 Statutes at Large, page 224, [consolidating and amending the laws relating to purchase of government annuities through savings banks]; (1854) 17 & 18 Vict., ch. 50, 94 Statutes at Large, page 181, [amending and continuing 11 & 12 Vict., ch. 133]; (1859) 22 & 23 Vict., ch. 53, 99 Statutes at Large, page 153, [allowing charitable societies to invest all their monies in savings banks].

visions for payment to the heirs or estate of a deceased depositor of only the decedent's deposit and interest. The descendants of the depositors in one of these early nineteenth century savings banks obviously would not have been entitled to participate in a division of the surplus fund. Even assuming that such descendants could have been ascertained, the determination of the portion of the surplus attributable to the ancestor's deposit would certainly have compelled a procedure of prohibitive cost. Indeed, we have been able to find no English decisions on this point; the lack of litigation on the issue indicates that depositors in English and Irish savings banks did not contemplate that their interests in the surplus survived the withdrawal of their deposits.

The early decisions in the United States accord with this conclusion. In the United States the courts have consistently recognized that any interest in the assets of a mutual savings bank is contingent upon depositorship. (*Cogswell* v. *Rockingham Ten Cents Savings Bank* (1879), 59 N.H. 43, 44;[12] *Hannon* v. *Williams* (1881), 34 N.J. Eq. 255, 258-259 [38 Am. Rep. 378] ;[13] *Lewis* v. *Lynn Inst. for Savings* (1889), 148 Mass. 235 [19 N.E. 365, 366-367, 12 Am.St.Rep. 535, 1 L.R.A. 785] ;[14] *Bank Comrs.* v. *Watertown Savings Bank* (1908), 81

---

[12] "[D]epositors in savings-banks stand in the same relation to the assets of the bank as stockholders to banks of discount. . . . They are the owners of the funds of the bank, entitled to share in its profits and liable to bear its losses *pro rata*, and upon the winding up of the business of the bank each *depositor* is entitled to his share of the assets or property remaining after the payment of the debts. The depositors are in fact the bank, while the corporation is but an agency for receiving and loaning the money of the depositors.'' (Emphasis partly added.)

[13] "Savings banks . . . have no capital stock. They are incorporated and organized not for the advantage of the corporators, but solely for the benefit of the depositors. . . . In a savings bank, the depositors bear, in great degree, the same relation to each other and to the property of the bank as do the stockholders in other monetary institutions. To the corporation itself they occupy the double relation of stockholders and creditors.''

[14] "At the outset, the chief purpose [of savings banks] was to encourage frugality by affording to persons of small means an opportunity to have their savings cared for by persons of experience, who, by combining the deposits, could make advantageous investments not available for small investors. And this purpose still exists. The corporation had no capital stock. . . . There was no relation of privity between successive depositors, as there is between successive stockholders in an ordinary corporation. No profit or benefit accrued to the managers. . . . *Gradually, with the progress of time, a practice grew up among savings banks . . . of reserving a guaranty fund to meet possible losses; but* the fundamental idea has never been departed from,—that *all the funds and investments of a savings bank are held exclusively for the benefit and security of the depositors.* This idea was and still is the corner-stone of the whole system.'' (Emphasis added.)

Conn. 261 [70 A. 1038, 1039]; *Huntington* v. *National Savings Bank* (1877), 96 U.S. 388, 393-395 [24 L.Ed. 777].[15]

That membership and membership rights in mutual savings banks terminated when one ceased to be a depositor has been stated by Justice Bray of this court in *Doyle* v. *Hibernia Bank, supra,* 156 Cal.App.2d 16: "In England and on the Atlantic Coast in the early days a common form of savings bank was one in which the depositors were the members and only those who were depositors at the time of liquidation of the bank could have any interest in its reserves. *Membership and interest in the bank's assets terminated upon withdrawal of the member's deposits.* (See *Society for Savings* v. *Bowers* (1955), 349 U.S. 143 [75 S.Ct. 607, 99 L.Ed. 950].)" (P. 20; emphasis added.) The court proceeds to state: "Plaintiff ... contends that although the membership ceases the member's right to a proportionate share in the reserves and assets continues on. However, if the member during his lifetime should allow his account to drop below $100 his right to such share did not continue on but ceased with his membership. This very fact shows that a member's right to participate in the reserves and assets depended upon his being a member at the time they were to be distributed, namely, on dissolution of the corporation. He had no right to receive any portion thereof as long as the corporation continued in existence. This was the holding in connection with a similar bank in *Society for Savings* v. *Bowers,* (1955), *supra,* 349 U.S. 143: 'The asserted interest of the depositors is in the surplus of the bank, which is primarily a reserve against losses and secondarily a repository of undivided earnings. So long as the bank remains solvent, depositors receive a return on this fund only as an element of the interest paid on their deposits. *To maintain their intangible ownership interest, they must maintain their deposits.* If a depositor withdraws from the bank, he receives only his deposits and interest ....' " (Pp. 21-22; emphasis added.)

---

[15] "It is true, the income or interest [from the deposits] is to be divided among the depositors, 'according to the terms of interest stipulated;' implying, perhaps, that the dividend may be less than the interest received by the corporation; but there is nothing in the charter that indicates the excess is for the benefit of the corporators. It is to provide for the necessary expenses of the institution . . . and perhaps to raise a contingent fund to meet possible losses. . . . [U]ntil recently, the primary idea of a savings bank has been, that it is an institution in the hands of disinterested persons, the profits of which, after deducting the necessary expenses of conducting the business, inure wholly to the benefit of the depositors, in dividends, or in a reserved surplus for their greater security. Such, very plainly, is the defendant corporation in this case."

The soundness of the *Doyle* rulings is confirmed by an appraisal of the bank's function and purpose. Membership without depositorship would be economically anomalous. The founders of Hibernia in 1859 expressed their object to be that "the members thereof may be enabled to find a secure and profitable investment for small savings" and the "opportunity of obtaining from it the use of a moderate capital. . . ." The by-laws indicate that deposits were restricted to members; appellants themselves contend that only members could be depositors. The bank thus depended upon the members for deposits. The foundation of investment and loan lay in the deposit. An academic and sterile "membership," detached from any contributions of deposits to the society could only frustrate its stated purpose. The successful operation of the bank depended upon the members' use of it; such participation in the form of deposits constituted an economic imperative.[16]

The particular dependence of the Hibernia banks upon deposits by the members becomes apparent upon analysis of their structures. As we have pointed out, the 1859 Hibernia could receive deposits only from members; the success of that bank therefore depended upon the participation of members in the form of deposits. While the 1864 corporation did not limit depositors to members, still the bank was structured upon the

---

[16]In this respect the mutual savings bank's situation did not differ from that of similar economic innovations of the same general historical period. Many cooperative marketing associations required by contract that a member market his produce or fruit through the association upon condition that if he failed to do so he pay liquidated damages to the association. In sustaining such a provision the court in *Anaheim C. F. Assn.* v. *Yeoman* (1921), 51 Cal.App. 759 [197 P. 959], emphasizes that the participation of the member is vital to the supplying fruit to the association. "From the nature of the organization and the statement of its purposes as found in its articles and by-laws, it can be fairly and reasonably inferred that by the co-operation of its members, mutual advantages would accrue to all through greater economy in handling and shipping and the securing of more advantageous marketing facilities. These results would be dependent directly upon the performance by the members of their agreement to deliver their fruit into the hands of the association for the purposes declared. . . . *The existence and life of the association itself depended upon its being furnished fruit to dispose of in the public market.* A reduction in the amount of fruit so handled would not only tend to increase the overhead cost to the nontransgressing members, but, we may assume, to some extent affect the prestige and standing of the association as a marketing concern." (P. 763; emphasis added.) (See E. G. Nourse, Agricultural Co-operation (1927), p. 282.) Indeed, as the court, in analyzing a stock savings bank, states in *State* v. *San Francisco Sav. etc. Society* (1924), 66 Cal.App. 53 [225 P. 309], "A savings bank . . . does the bulk of its business on borrowed capital—that is, on the moneys deposited therein by the depositors. . . . *Indeed, without such deposits it could not survive as a savings bank.*" (P. 62; emphasis added.)

concept of the member-depositor; and only such persons could elect the directors, each member being entitled to one vote per one hundred dollar deposit. Although deposits could be received from nonmembers, such deposits could not conceivably have been regarded as the sole source for the success of the bank. The members' deposits were surely expected to nourish it. Indeed, if the members' obligation to deposit were not regarded as inherent in their relationship both to the corporation and their fellow members, a stock structure would have better suited the purpose of the 1864 corporation. Significantly, the certificate of incorporation reveals that "the object for which it is formed is that of aggregating the funds and savings of the *members* . . . and of others." (Emphasis added.)

We believe, then, that the nature of the mutual savings bank as set up by the English statutes, as defined by the courts, and as held by *Doyle,* precludes the establishment of rights of membership divorced from depositorship. The very function and purpose of such banks, as well as the nature of the Hibernia corporations, confirms the requirement of depositorship for membership.

We turn to appellants' answering contention that membership survives the withdrawal of the deposit balance[17] because the entrance fee of two dollars kept the membership alive; that Mel and Masten's rights in Hibernia of 1859 carried them into Hibernia of 1864, and that the Bennett case (*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540), supports this position.

Although appellants equate the entrance fee of two dollars with a deposit, it performed the function which its name implied: it was a nonrefundable payment for the privilege of membership; it purchased[18] the membership which we have

---

[17]Appellants' claim of interest in Hibernia's assets is rather vacillating; on the one hand they contend that the "members" are the co-owners of the bank's "business and assets," yet they also state that "the depositors . . . are co-owners of the business. . . ." As we have indicated, the latter statement is the correct one; appellants' citation of *City of Los Angeles* v. *State Loan etc. Co.* (1895), 109 Cal. 396, 379-402 [42 P. 149], and *State* v. *San Francisco Sav. etc. Society, supra,* 66 Cal.App. 53, 63-64, corroborates our conclusion. Indeed, these two cases indicate that the membership, which creates an interest in a mutual savings bank, is coextensive with depositorship.

[18]"Another feature of policy which seems to prevail generally, if not universally in California, is the requirement, in institutions having no capital stock, of *an admission or entrance fee of two dollars from each member,* which goes to the formation of a sinking or guarantee fund, corresponding with the surplus fund of eastern institutions. . . . The idea of a fixed contribution to a guarantee or surplus fund, which the depositor

described, a membership dependent upon and coincident with depositorship. When the member withdrew his deposit his membership ceased. By a subsequent deposit the party could perhaps revive his membership, but during the period of nondeposit he could not be a member. The entrance fee, which was not a deposit, did not affect or enlarge the nature of the membership and did not, as appellants argue, substitute for the deposit.

The payment of the entrance fee did not grant to appellants' predecessors any right in Hibernia of 1864. On August 30, 1864, Hibernia was incorporated. The members of Hibernia of 1859 as of August 29, 1864, became members of the new corporation. (*Bennett* v. *Hibernia Bank, supra,* 47 Cal. 540, 551.) On August 29, 1864, appellants' predecessors did not have any deposits in the bank. Even if they *could* have had a deposit in Hibernia of 1859 they *had* no such deposit on the crucial day, and they therefore never became members of Hibernia of 1864.

Even if we were to assume, as appellants argue, that the entrance fee gave a ''liberty to make deposits'' pursuant to article 21 of the by-laws, that is, preserved a right to redeposit in Hibernia of 1859, and that this right extended to Hibernia of 1864, entitling appellants' predecessors to deposit in Hibernia of 1864, such a right could properly be retroactively cut off by subsequent by-laws. Article 4 of the 1864 by-laws, as amended on February 10, 1868, provided that no one should be a member whose account was once closed. As *Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, states, such a by-law is valid if it would not unreasonably deprive the member of his membership rights. ''The reasonableness of the by-law must be considered in the light of all the circumstances, including such matters as the purposes for which the corporation was organized and the extent of the rights of the particular member involved.'' (P. 552.) Since no other extrinsic evidence has been produced, we test the by-laws in the light of this precept and we find nothing unreasonable in the severance of the tenuous and narrow right to redeposit in the new corporation.

thus surrenders absolutely, has this to recommend it, that the institution is at no time sailing under false colors, as is the case where the first deposits are all expended for furniture, fixtures and books, and still the delusive notion is held out that the depositors may, at any time, rightfully demand the return of their deposits in full, regardless of the fact that they have taken forms which render such return impossible.'' (2 Keyes, History of Savings Banks in the U.S., *supra,* pp. 463-464; emphasis added.)

In the first place, the severed right was but an insubstantial one, and, as we point out *infra* in our discussion of descendibility, the by-laws may properly terminate a right which lacks substance. In the second place, the severance was proper in the light of the purposes of the bank. We need not repeat here the many reasons set forth above why deposits by members constituted so vital a consideration to the bank. The member who did not exercise such right to deposit contributed nothing to the bank. A by-law could reasonably sever a right left dormant and unused; it could reasonably eliminate dead-wood inchoate members whose failure to deposit impeded, partially at least, the achievement of the corporate purposes.

In conclusion on this point, we believe that while appellants rely upon *Bennett*, its language as to retroactivity applies directly: "It may be that it was considered necessary to require members to retain their accounts and deposits with Hibernia in order to promote the success of the bank in accordance with the purposes for which it was organized." (*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, 553.)

**5.** *The descendibility of the rights of appellants' predecessors.*

Assuming Mel and Masten were members of "Hibernia of 1859" on August 29, 1864, and became members of Hibernia of 1864, we must determine if such postulated membership would survive their deaths in 1892 and 1901 respectively. Appellants contend, in substance, that respondents' affidavits fail to defeat appellants' cause of action because the affidavits rely upon the subsequent by-laws of 1864 to sever the descendibility of membership; that if the by-laws be so construed they are void; that the by-laws attempt the abrogation of property rights in membership; that transferability is an attribute of such property right.

We set out three answers to these contentions: (1) If Mel and Masten became members of Hibernia of 1864 they were bound by the terms of such membership, which carried with it the authorization to the board of directors, pursuant to the act of 1862 to pass the by-laws in question, and these by-laws severed descendibility in view of the decisions in *Bennett* and *Doyle*; (2) the severance of descendibility did not retroactively forfeit any right of Mel or Masten since the nature of Hibernia of 1859 and the 1859 by-laws disclose that that institution conceived of a selected and nondescendible mem-

bership; (3) assuming the by-law did work a retroactive effect, *Bennett* sets out the applicable test that the by-law will stand if reasonable in the light of all the circumstances; here the validity of the by-law is sustained under that test.

Turning to the first issue, it is apparent that, since appellants must rely upon their ancestors' memberships in Hibernia of 1864, their position must be tested by the definition of membership in that corporation. If limitation upon descendibility properly inhered in such membership, appellants cannot claim descendibility. The key question turns on the status in the 1864 corporation of the member of the original 1859 corporation and whether such membership carried with it the right of descendibility.

We are concerned for this purpose with the nature of the 1864, not the 1859, structure. Whatever rights appellants' ancestors may have had in the first corporation, they are not presently material because, as the Supreme Court stated in *Bennett,* "Hibernia thus became a valid membership corporation in August 1864, regardless of what its prior legal status may have been." (*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, 551.) We must therefore determine, first, the *power* of the board of directors of the 1864 corporation to enact the by-laws here pertinent and, second, the *scope* of those by-laws.

As we shall explain, we believe the Legislature validly *empowered* the board to fix the composition of the membership by enacting the act of 1862. (Stats. 1862, p. 200.) To quote *Bennett,* "Under the 1862 act one of the purposes for which the corporation, and hence the directors, could make by-laws was to regulate 'the time and manner in which any person may become, or may cease to be, a member of the corporation.' . . . This language was broad enough to permit the directors to adopt by-laws specifying the conditions under which membership rights might be acquired or lost." (*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, 551.) In view of this holding of *Bennett* we believe that the board of directors did have authorization under the act to determine the composition of the membership of the 1864 corporation.

Appellants in substance contend that the by-laws could not validly sever the right of descendibility and that neither legislative enactment nor by-law provision could remove the member's right of descendibility without violation of due process. As we shall point out, however, two decisions recognize the authority of the Legislature to give the power of selectivity of membership to the board. *Bennett* specifically

states: "*In the absence of a statute, by-law or other regulation to the contrary,* these rights [property rights in the assets of the corporation] were transferable." (Pp. 551-552; emphasis added.) The court then proceeds to analyze the effect and application of article 4 of the by-laws and poses the question whether or not it controlled those who became members *before* or *after* its adoption. The court does not raise even the scintilla of a question that the statute authorizing, or the by-law exercising, selectivity of membership was invalid. Indeed, it states the opposite; the right of transferability survives only in the *absence* of such a statute or by-law. The court defines the issue for the trial court as one of interpretation only, in which extrinsic evidence would be appropriate to ascertain the proper construction. The Supreme Court would not have called upon the trial court to determine if the by-law were retroactive if such an application would do no more than render it invalid.

*Doyle* reiterates the *Bennett* ruling that the statute validly authorized the board to select the membership of the corporation and to prevent acquisition of membership by any means other than those designated. The court states: "*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d 540, held that under the 1862 act the by-laws could provide the conditions under which membership rights might be acquired or lost." (*Doyle* v. *Hibernia Bank, supra,* 156 Cal.App.2d 16, 20.) The two decisions thus sustain the legislative power to give Hibernia of 1864 the right to determine its composition and to exorcise any claimed right of transferability in members of Hibernia of 1859. Neither the decisions nor the statute itself suggest that the statute gave the board the right to provide for the manner in which a person could become a member, *with the exception* that members of Hibernia of 1859 retained the right to assign membership by manner and means of transfer. The Legislature gave a complete and unlimited right to determine membership.

 We turn, then, to the next question as to how the board used the right so granted to it: the scope of the by-laws. Did the by-laws limit the right of membership in such fashion as to eliminate transferability of membership? Article 4 of the 1864 by-laws, as we have stated, provided that "[a]ll persons who were members of The Hibernia Savings and Loan Society [of 1859] on the twenty-ninth day of August, 1864, shall be deemed and considered members of this corporation," and that "[o]ther persons may be allowed to become

members of this corporation by a vote of the Board of Directors, and not otherwise.'' Did the by-laws set up a bifurcated membership with one class of membership which entailed transferability and another which negated it?

We do not believe that Hibernia of 1864 contemplated two classes of membership with divergent rights. The by-laws themselves, the agreement to become members, and the previous judicial interpretations indicate that the bank consisted of one type of membership embracing both those who had been members of Hibernia of 1859 as well as those subsequently selected for membership.

The agreement to become members, issued at the same time as article 4 was framed, and itself referring to the by-laws, discloses that the objective was to set up one class of membership. Certainly it provided that the members of Hibernia of 1859 ''adopt, accept, ratify and approve'' the incorporation of the society under the 1862 act; these persons ''grant & convey, assign, transfer and set over to . . . the Corporation incorporated under . . . [the 1862 act], all our and each of our right, title and interest in and to all the property'' of Hibernia of 1859. These members of the prior organization agreed to become members of Hibernia of 1864. Persons who were not members of Hibernia of 1864 likewise ''agree to become, and each of them is hereby declared to be, a Member of said Corporation.'' Thus both the older group of members of Hibernia of 1859, as well as the new group who were not members of Hibernia of 1859, agreed to become members of the new corporation. Nothing whatsoever indicates that the former were to retain certain rights which were not to be enjoyed by the latter. The instrument breathes of the purpose of setting up a single class of membership. Nor is it material for this purpose whether appellants' ancestors signed the agreement to become members, as did Curtin, the predecessor, in *Bennett*. The relevance of the document lies not in its effect as an express agreement by the ancestor regarding his rights but as an indication of the kind of organization the incorporators established.

The concept of a single membership, none of whom would *per se* enjoy the right of descendibility, accords with the implications which arise from the plan and purpose of Hibernia of 1864. At the time the parties became members of the 1864 corporation they obviously were all living. Consequently, the possibility of the enjoyment of these contingent rights lay entirely in the future. The severance of such future

rights affected one class as much as the other. To hold that members of the new corporation would agree to, and were entitled to, lesser rights on this score than those of the old corporation is to hypothecate an unsupported duality. We cannot consider that the incorporators planned to establish differing classes of membership with divergent rights although they did not use a single word to say so.

The cases substantiate this reasoning. *Bennett* suggests no doubt of the *meaning* of the by-law as to prohibition of descendibility but questions whether the by-law should be *applied* to "any member" or "as governing only the rights of those who might join the corporation after adoption of the by-law and as providing that such persons, upon becoming members, would acquire only nontransferable membership rights." (P. 552.) Nondescendibility would in such case cover future members only. The court held that upon trial "the parties should be entitled to produce extrinsic evidence in support of their respective interpretations." (P. 552.) Appellants have presented no such extrinsic evidence here.

*Doyle* likewise holds the two described methods of acquisition of membership to be exclusive. There the ancestor became a member after 1864 by election of the board of directors; this court held in the absence of "any suggestion of evidence to be offered on the interpretation of the by-laws as to membership" his "property rights" terminated upon his death and the trial court properly granted the summary judgment for defendants. (P. 19.) Beginning with the premise that *Bennett* "held that under the 1862 act the by-laws could provide the conditions under which membership rights might be acquired or lost" the court states that its task is "to determine what the by-laws provided concerning membership rights upon the death of a member." (P. 20.) As to this, "The only provision on the subject is in section 4." (P. 20.) Noting that this section and subsequent amendments provided exclusively for the two classes of membership described above, the court concludes, "While there is no express statement of what would happen in the event of the death of a member, it is clear that his membership thereby terminated and could not pass on to his heirs for the reason that membership was entirely dependent upon vote of the directors." (P. 21.) (*Doyle* v. *Hibernia Bank, supra,* 156 Cal. App.2d 16.)

Tieing the by-law into the 1862 act, the court described

the incongruity of Doyle's attempted interpretations: "The Act of 1862, (Stats. 1862, ch. 187, p. 200) prescribed that the by-laws could provide 'the time and manner in which any person may become, or cease to be, a member of the corporation. . . .' It would be a rather distorted interpretation to hold that in providing that except as to the then existing members, 'other persons' could only become members by vote of the board of directors the by-laws meant *any other person than heirs of a member.* Likewise it would be a similar distortion to hold that although not members such heirs would have all the rights of members." (Pp. 22-23; emphasis added.)

*Bennett* states that the board had the *power* to pass the by-laws, binding upon all members of Hibernia, of 1864; *Doyle* holds that the board *exercised* the power and passed by-laws which prohibited any right of descendibility or inheritability.

The *Doyle* interpretation that the by-law did not allow for descendibility finds a parallel in the situation in *Taylor* v. *Edson* (1849), 58 Mass. (4 Cush.) 522. Here, in the language of the Massachusetts Court, the legislative act provided "that the corporation should have power to make by-laws, determining the manner by which persons should thereafter become members thereof." (P. 523.) Subsequently the defendant religious society, "in pursuance of the authority conferred," adopted a by-law that persons who annually paid a specified sum ". . . 'shall be deemed members'. . . ." (P. 523.) Plaintiff, an original incorporator of the society, and a recorded member for thirty years, refused to make the payments, and the society, in turn, "because he had failed to comply with the by-laws above mentioned," refused to permit him to vote. (P. 524.) In his subsequent action to establish membership, the court held, first, that the society had the power to adopt the by-law, and, second, that it applied "to those who were members before its adoption." (P. 528.) The court said: "The language of these by-laws is general; and the subject of them as stated in the title is 'membership.' The obviously expedient rule, and one we should anticipate would be adopted, would be one alike operative upon old and new members, in reference to their liabilities and forfeitures for neglect to contribute to parochial charges. The symmetry of the system would require such a rule, and this seems to be the reasonable construction of these by-laws." (P. 528.)

While appellants seek to distinguish the case upon the ground that the court narrows its inquiry as to the validity

of the by-law to the special laws governing religious societies, this limitation pertained to the power of the society to pass the by-law rather than the scope of it. The decision buttresses *Doyle* as to the meaning of the by-laws here in question.

Appellants attempt to distinguish both *Bennett* and *Doyle.* As to *Doyle,* they contend that the involved membership did not begin until 1889, long after the enactment of the involved by-laws. This fact, however, does not detract from the court's interpretation of the application of the by-laws. As to *Bennett,* appellants offer two comments which we now discuss.

First, appellants argue that the September by-laws must be treated as "subsequent" to incorporation of Hibernia of 1864; hence, "retroactive" and invalid. The fact, however, that the by-laws were passed some thirty days after the filing date of the certificate of incorporation does not make their operation "retroactive" in the sense claimed by appellants. The by-laws defined the rights of the members and the method of operation of the corporation. To contend that upon the day of filing of the certificate, the rights of a member become inviolate, so that any by-law worked a *retroactive* effect upon him, is to establish unrealistic artificialities in the corporation. Since the drafting of by-laws necessarily followed the filing of articles, the corporation in the very process of formation, upon appellants' hypothesis, would inevitably have been saddled with rights of members which the by-laws could not "retroactively" impair. Such a construction would be in basic conflict with the provisions of the statute which gives the directors the power to fix the terms of membership. Hence *Bennett* does not treat these by-laws of 1864 as retroactive, subject to the test of reasonableness, the test which it does apply to the 1868 by-laws, enacted, not in the period of the corporation's formation, but long afterwards.

Second, appellants attempt to distinguish *Bennett* upon the ground that Curtin signed the agreement to become members and thereby ratified the by-laws of September, 1864. Since neither Mel nor Masten signed such agreement, Curtin's ratification, appellants claim, makes inapplicable here the ruling in *Bennett.* But, as *Bennett* points out, Curtin's agreement to become a member "does not necessarily mean anything more than he was agreeing to the reorganization under that particular statute rather than to corporate existence of some other type." (P. 553.) It would not necessarily extend "to subsequent steps taken by the new ·corporation

such as the adoption of by-laws.'' (P. 553.) Curtin did not, therefore, necessarily ratify the by-laws of 1864 or 1868. If he had, such ratification would have been a complete defense to an attack upon both sets of by-laws, and the issue would have been resolved. But the fact that ratification would have sustained them does not mean the by-laws of 1864 are not otherwise valid. As we have said, *Bennett* upholds their validity upon the ground that they were authorized under the act of 1862, and the subsequent discussion of the effect of the alleged ratification does not in any way disturb that ruling.

Concluding that the board exercised its valid authority to sever descendibility of membership, we turn to the second issue which we suggested above. Even upon the assumption that the by-laws of 1864, based upon the 1862 statute, could not operate to deprive all members of Hibernia of 1864 of descendibility, but that the members of Hibernia of 1859 constituted a special class, whose rights must be separately tested, we doubt that the right to membership was descendible. Appellants' contention that the by-laws unlawfully attempted to sever retroactively the right of descendibility which inured in that membership poses the underlying question of whether the original 1859 membership actually encompassed descendibility; whether such a right existed in the first instance.

Looking at the bank in the light of the contemporaneous objectives we find the certificate of incorporation expresses two basic purposes: '' [T]hat the object for which it is formed is, that by means of it the members thereof may be enabled to find a secure and profitable *investment for small savings,* and may have an opportunity of *obtaining from it the use of a moderate capital,* on giving good and sufficient security for the repayment of the same. . . .'' (Emphasis added.) These purposes found concrete application in the provisions for the ''liberty'' to deposit and the opportunity to obtain loans. Since members had the right to obtain loans, it is extremely doubtful that the founders intended that persons not selected for membership could acquire it by assignment, heirship or otherwise. The poor credit responsibility of such membership could destroy the bank. The history of banking institutions in the immediate prior period in San Francisco had been marked by such failures.[19] The early history of savings

---

[19] ''In 1855 as the result of bad banking methods several financial institutions failed, and the business community suffered severely. There were

banks in Scotland and Britain discloses a purpose to make possible small savings for special groups.[20] As we have pointed out, one of the stated purposes of the organization of the bank was to adopt "some plan by which the thousands of Irish, residing in this country might have some secure place of deposit for their savings. . . ." In the early nineteenth century the idea of closed and special membership was common to fraternal benefit associations, labor unions and similar institutions and obtained, at the time, unquestioned acceptance in the courts.[21] The above considerations cast grave doubt upon appellants' claim of promiscuity of membership in Hibernia of 1859; selectivity of membership would appear to be inherent in its nature.

Significantly, the by-laws limit the transferability of shares to members: "[S]uch share may be transferred on the books of the Society to *any member* of the same, by the owner paying

---

197 failures with liabilities amounting to $8,000,000. . . . The banking trouble of this period was largely attributed to the failure of the State to exercise a proper surveillance over the operations of financial concerns. Owing to the distrust of corporations which was excessive at the time of the adoption of the first constitution the state was prohibited granting charters for banking purposes, or of the issuance and circulation of bank notes. . . ." (John P. Young, San Francisco, A History of the Pacific Coast Metropolis (S. J. Clarke Pub. Co., 1912), vol. I, p. 282.)

[20]The illuminating history of the savings bank movement in Britain and Scotland is set out in Horne, A History of Savings Banks (Oxford University Press, 1947) and Kniffin, The Savings Bank and its Practical Work (The Bankers Publishing Company, 1928). Conceived as a method of encouraging thrift to meet the problems of deep poverty of the early nineteenth century, the advocates of savings banks made use of the "friendly societies" of the day as a prototype organization (Horne, pp. 4-42ff). Dr. Duncan of Ruthwell, Scotland, generally accredited with having established the first successful savings bank, saw its purpose to be the facilitation of the making of small savings; "[s]avings banks in every parish would restore the independence of the Scottish people." (Horne, p. 43.) The Ruthwell Savings Bank, which opened in 1810, set up elaborate rules for three types of membership and provided even for "inquiries into the morals of the depositors." (Horne, p. 47.) The depositor's "age, family affairs, moral conduct, etc." were looked into and if the report was favorable he was allowed to " 'join the bank'. . . ." (Kniffin, p. 9.) The banks made possible the deposit of small savings with interest rather than the procurement of loans to borrowers. The Edinburgh Bank, founded in 1814 and based upon the same idea, "did not make inquiries into the morals of the depositors. . . ." (Horne, p. 47.) Banks "were started all over Scotland in 1814 and 1815 . . . sometimes founded on the Ruthwell model and sometimes on that of Edinburgh" (Horne, p. 47), but the Edinburgh type actually prevailed.

[21]See *Greenwood* v. *Building Trades Council* (1925), 71 Cal.App. 159, 171 [233 P. 823]; *Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550]; 29 Cal.Jur.2d 793, § 55.

a fee of Fifty Cents, for the transfer of each share, and surrendering the Certificate which shall be marked 'cancelled' on its face.'' (Emphasis added.) And, since the ownership of shares represents a higher level of participation in the corporation than membership, the express limitation upon transfer of the former indicates a similar intention as to the latter. The by-laws nowhere provide for transfer of shares or membership to those other than shareholders or members. While the by-laws do not expressly prohibit transferability, we believe the injection of such a right inconsistent with the scheme, the purpose, the function of the institution.

If transferability did not inhere in membership of Hibernia of 1859, the by-laws of 1864 did no more than make express that which was implied, and they did not operate retroactively at all. ▉▉▉▉ Finally, however, assuming that the by-laws of 1864 did retroactively sever such a right, we reach the third issue set out above. If the by-laws did operate retroactively, they were not void, but subject to the test described in *Bennett*.

While *Bennett* did not apply the test of reasonableness to the prohibition of the transferability of the membership but only to the requirement for depositorship, the test would, if prohibition of transferability were found to be retroactive in effect, likewise apply to such a provision. The by-law which retroactively attached the condition of depositorship to the membership would be no different in kind than a by-law which retroactively removed the attribute of transferability. Both the loss of membership by nondepositorship or by invalidity of transfer attach qualities or characteristics to membership. If one may be removed or imposed, so may the other. Indeed, appellants themselves, claiming that the by-laws are retroactive, recognize the applicability of the test set out in *Bennett*.

▉▉▉▉ The *Bennett* test is two-pronged: ''The reasonableness of the by-law must be considered in the light of all the circumstances, including such matters as the purposes for which the corporation was organized and the extent of the rights of the particular member involved.'' (*Bennett* v. *Hibernia Bank, supra*, 47 Cal.2d 540, 552.) ▉▉▉▉ We probe the ''purposes'' of the association as well as the ''rights'' of the members. As to the latter, the cases cited by *Bennett* as well as those relied upon by appellants, disclose the nature of the rights of a member which a by-law cannot retroactively extinguish.

*People's Home Savings Bank* v. *Superior Court* (1894), 104 Cal. 649, 653 [38 P. 452, 43 Am.St.Rep. 147, 29 A.L.R. 844], cited in *Bennett,* states: "The *substantial* rights of a stockholder under the law cannot be taken from him, or even abridged by the by-laws." (Emphasis added.) *State* v. *San Francisco Sav. etc. Soc.* (1924), 66 Cal.App. 53 [225 P. 309], likewise cited by *Bennett,* quoted 3 R.C.L., section 339, to the effect that ". . . 'the fact that a by-law of which a depositor has notice authorizes the amendment of the by-law does not operate to change the depositor's contract where a *material amendment* to the by-law is made without notice to him, and without his consent.' " (P. 61; emphasis added.) *Bornstein* v. *District Grand Lodge No. 4* (1906), 2 Cal.App. 624 [84 P. 271], cited in *Bennett,* as well as by appellants, relies upon *Langan* v. *American Legion of Honor* (1901), 34 Misc. 629 [70 N.Y.S. 663], to the effect that the power to make changes in the by-laws that had a retroactive effect "had reference to changes which should not impair the *substance* of the contract." (P. 631; emphasis added.) *Inderkum* v. *German Old People's Home* (1937), 23 Cal.App.2d 733, 736 [74 P.2d 83], cited by appellants, holds: "The rule established by said authorities appears to be that such contracts are not void for lack of mutuality as the right reserved extends merely to the making of reasonable administrative or regulative amendments and does not extend to the making of any amendments *which would impair the substance of the contract.*" (Emphasis added.)

Tested by whether or not the loss of descendibility was "substantial" in view of the purposes for which the corporation was organized, the by-laws were reasonable. Obviously the 1864 structure constituted a membership corporation; its by-laws expressly provided for selectivity of that membership. The right to transfer membership would nullify any possibility of maintaining an exclusive and chosen membership. In the turbulent days of 1864 when San Francisco was a mecca to the varied peoples of the world, the right to transfer membership could result in the inclusion of all kinds of persons, quite different from those who undertook the bank's establishment. The protection against such incursion worked as much to the advantage of the former members of Hibernia of 1859 as to those who subsequently became members. It preserved the continuity of a special membership and the integrity of the bank in accordance with the purposes of the by-laws. Thus members of Hibernia in 1859 *lost* no

substantial right by the by-laws of 1864 but *gained* protection against an unwanted heterogeneous and polyglot membership. In this light, the power to transfer membership or grant it through heirship, exercisable only in the future, was insubstantial and minor as compared to the immediate importance of preserving a kind of membership which the founders intended. Thus the elimination of promiscuity of membership, instead of defeating a substantial right of members of Hibernia of 1859, implemented the purpose of the incorporators of Hibernia of 1859 to set up an institution composed of a special and selected membership. Compounded upon the purposes of the bank, the insubstantiality of the severed "right" confirms the conclusion that the by-law was reasonable "in the light of all the circumstances."

In summary we do not believe that the alleged membership of appellants' predecessors in Hibernia of 1864 carried with it the right of descendibility; we doubt the presence of any such right in membership in Hibernia of 1859; but, even accepting appellants' argument that there was a retroactive severance of such right, such severance was reasonable.

We conclude this lengthy rehabilitation of events long since passed with the conviction that appellants can neither surmount the discontinuation of their predecessors' depositorship in Hibernia nor their deaths of more than a half century ago.

We affirm the judgments.

Bray, P. J., and Ford, J.,* concurred.

A petition for a rehearing was denied December 27, 1960, and appellants' petition for a hearing by the Supreme Court was denied January 25, 1961. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.