UNITED STATES of America,
Appellant,

v.

Frank M. CHICHESTER, Trustee in
Bankruptcy of The Aircraftsmen
Company, Bankrupt, Appellee.

No. 17547.

United States Court of Appeals
Ninth Circuit.

Jan. 7, 1963.

William H. Orrick, Jr., Asst. Atty. Gen., Francis C. Whelan, U. S. Atty., Alan S. Rosenthal and Kathryn H. Baldwin, Department of Justice, Washington, D. C., for appellant.

George W. Lupton, Jr., Los Angeles, Cal., Craig, Weller & Laugharn, and H. F. Laugharn, Los Angeles, Cal., for appellee.

Before BARNES, JERTBERG and BROWNING, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is an appeal by the United States from an order of the District Court affirming an order of the Referee in Bankruptcy disallowing the amended claim of the United States.

The jurisdiction of the United States District Court rests upon Title 28 U.S.C. § 1334, and § 2 of the Bankruptcy Act, Title 11 U.S.C. § 11. The jurisdiction of this Court has been properly invoked under Title 28 U.S.C. §§ 1291 and 1294, and § 24 of the Bankruptcy Act, Title 11 U.S.C. § 47.

The basic question presented by this appeal is whether the United States properly terminated for default a contract between the Department of the Army of the United States and The Aircraftsmen

Company for the manufacture and delivery of fire bombs.

The following facts are not in dispute and may be summarized as follows:

On June 28, 1954, The Aircraftsmen Company (hereinafter sometimes referred to as "the contractor" and "the bankrupt") entered into a contract with the Department of the Army for the manufacture and delivery of 73,944 fire bombs at a fixed unit price and in accordance with a specific delivery schedule commencing in December, 1954.

The contract per unit price was increased by modification on February 25, 1955, and Modern Metal Spinning and Manufacturing Company, the parent corporation of the contractor, was required to guarantee performance of the contract. On March 8, 1955, the "payments" article of the contract was amended to permit the contracting officer to allow, from time to time, progress payments.

Production delays were encountered and prior to June, 1955, only 4,550 units had been delivered. By a modification dated May 25, 1955, a new delivery schedule for the remaining 69,394 bombs was set up which called for delivery of 5,000 units in June of 1955, 8,000 units per month during July of 1955 through February of 1956, with the balance of 394 units due in March of 1956. This was the delivery schedule under which the contractor was operating at the time of termination.

The contract performance went forward during June of 1955 but deliveries for that month totaled 4,630 units. In July of 1955, the contractor delivered 6,830 units.

On August 12, 1955, the contractor applied for relief under Title II of the First War Powers Act, as amended, 50 U.S.C. Appendix § 611. And on October 28, 1955, the contract was modified by increase in unit prices. This award amounted to almost $1,000,000 of which $95,000.00 was paid in cash to the contractor and the balance was offset against unliquidated progress payments.

The parties then executed a supplemental agreement, dated November 14, 1955, which implemented the award and made provision for certain safeguards which the contracting officer considered necessary to the Government's interests. By a supplemental agreement dated December 16, 1955, it was agreed that the contractor would furnish to the Government certain technical data and that delivery of these items was to be made at the time of delivery of the final quantity of bombs.

Through the remainder of 1955, the contractor delivered 6,490 bombs in August; 7,140 in September; 6,134 in October; 7,675 in November; and 8,066 in December. In January 1956, the contractor delivered 7,120 bombs.

In the latter part of January 1956, the contractor advised the contracting officer that it was "in critical financial condition" and discussed the possibility of further financial relief. Under date of February 6, 1956, the contractor applied for further Title II relief which was submitted with the contracting officer's approval. The application stated that the contractor "cannot possibly remain in business longer than another seven (7) days due to pressure from creditors and lack of money to meet operating expenses including payrolls," and it was stated that the Government was over-extended on its progress payments. The last progress payment submitted was paid on February 8, 1956, and the contractor was advised on February 10, 1956 that further progress payments were being withheld. On the same date, the contractor laid off its employees who were working on this contract but not its supervisory personnel engaged in the fire bomb program. No bombs were manufactured after February 13, 1956, but between February 1st and 14th of 1956, 3,920 bombs were delivered, and in March of 1956, 531 bombs were delivered and accepted.

The following table shows monthly deliveries and acceptances of fire bombs

for the period June, 1955, through March, 1956; monthly units due for the same period under the delivery schedule; and cumulative monthly shortages.

| | Units Due by Month End | Units Delivered | Unit Shortage | |
|---|---|---|---|---|
| | | | For Month | Cumulative |
| June 1955 | 5,000 | 4,630 | 370 | 370 |
| July " | 8,000 | 6,830 | 1,170 | 1,540 |
| Aug. " | 8,000 | 6,490 | 1,510 | 3,050 |
| Sept. " | 8,000 | 7,140 | 860 | 3,910 |
| Oct. " | 8,000 | 6,134 | 1,866 | 5,776 |
| Nov. " | 8,000 | 7,675 | 325 | 6,101 |
| Dec. " | 8,000 | 8,066 | 66 (overplus) | 6,035 |
| Jan. 1956 | 8,000 | 7,120 | 880 | 6,915 |
| Feb. " | 8,000 | 3,920 | 4,080 | 10,995 |
| Mar. " | 394 | 531 | 137 (overplus) | 10,858 |

On February 28, 1956, the contractor supplemented its application for Title II relief and requested an immediate cash advance.

On March 1, 1956, a hearing was held before the Army Contract Adjustment Board; and on March 23, 1956, the Board declined to grant the application for relief.

On March 26, 1956, the contracting officer notified the contractor by telegraph, following reference to the contract, that:

"in accordance with the General Provision entitled 'Default' your right to proceed further with delivery of the balance of 10,858 bombs of Item No. 1 under said contract is hereby terminated in whole for default, effective upon receipt of this notice. Letter follows.

"The Government hereby asserts title to the raw materials, work in process, finished items and special tooling manufactured or acquired in the performance of, and in accordance with the terms of the contract."

By letter dated March 27, 1956, the contracting officer notified the contractor, after referring to the contract, as follows:

"2. In accordance with the telegraphic notice dated 26 March 1956, your right to proceed further with delivery on the balance of 10,858 Bombs of Item No. 1 under said contract *was terminated in whole for default.*

"3. The acts or omissions constituting a default under said contract are as follows:

"(a) Failure to deliver the quantity of Item No. 1 in accordance with the delivery schedule set forth in Supplemental Agreement No. 25, which required delivery to the Government of 8,000 Bombs per month commencing July 1955; and

"(b) Contractor suspended production on or about 13 February 1956, and contractor advised the Government of its inability to continue performance.

"4. The aforesaid supplies, if required by the Government, will be procured in the open market against your account, and you will be held liable for any excess costs.

"5. The Government reserves all rights and remedies provided by law or under this contract, in addition to charging excess costs.

"6. The Government hereby asserts title to the raw materials, work in process, finished items and special tooling manufactured or acquired in

the performance of, and in accordance with the terms of the contract." (Emphasis in quoted material.)

The letter also stated that the notice constituted a Finding of Fact, pursuant to the Disputes Article of the contract from which the contractor had a right to appeal to the Armed Services Board of Contract Appeals, as provided in "disputes" Clause 12 of the contract.

On March 30, 1956, an involuntary petition in bankruptcy was filed against the contractor, and on April 17, 1956, the contractor was adjudicated a bankrupt. A preliminary and contingent proof of claim based upon termination of the contract was filed by the Government in June of 1956.

By letter dated October 25, 1956, the Government terminated, for default, the Trustee's right to proceed with the delivery of the technical data covered by the supplemental agreement dated December 16, 1955, on the ground that the Trustee was in default for failure, within 60 days after adjudication of bankruptcy, either to assume or reject the contract.

Pursuant to authority granted by the Bankruptcy Court, the Trustee instituted and prosecuted appeals to the Armed Services Board of Contract Appeals.[1]

Following an extensive hearing before the Armed Services Board of Contract Appeals, the Board rendered its decision under date of March 26, 1958, denying in all respects the three appeals. In short, the Board concluded that the contract reserved options to the contracting officer to terminate the contract exercisable at the end of each month if the contractor failed to meet the month's quota; that neither the contracting officer's action in recommending approval of the

Title II application for relief in February of 1956 nor his action in accepting the deliveries in March of 1956 constituted a relinquishment of the Government's right to terminate the contract for the February shortage; that the contract was validly terminable for default on March 26, 1956 on two grounds: (1) failure of the contractor to meet the February, 1956 delivery requirement by approximately 50 per cent, and (2) anticipatory breach; and that the balance of the contract pertaining to the technical data was validly terminated for default on October 25, 1956.

The Government filed in the Bankruptcy Court, on August 25, 1958, an amended proof of claim in the amount of $450,008.50 showing the amount of $437,059.00 due the Government under the fire bomb contract.[2] The Trustee filed objections to the claim, maintaining, among other things, that the termination of the contract for default was invalid, and that termination of the contract must be considered a termination for convenience of the Government under Clause 25 of the General Provisions of the contract.

By order of the Referee, the entire record before the Armed Services Board of Contract Appeals was received into evidence; and upon agreement of the parties, the issues were separated, and those pertaining to the validity of the Board's decision on the termination of the contract were submitted for determination on the Board's record.

The Referee disallowed the entire claim of the Government, concluding that the decision of the Armed Services Board of Contract Appeals was not supported by substantial evidence and was contrary to law.

---

1. Three appeals were filed. Two of these were by the Trustee from the two decisions of the contracting officer, the first terminating the fire bombs portion of the contract on March 26th and 27th, 1956, and the second terminating, on October 25, 1956, the supplemental agreement dated December 16, 1955, wherein it was agreed that the contractor would furnish

to the Government certain technical data. The third appeal was by Modern Metal Spinning and Manufacturing Company, as guarantor on the contract, from the first default.

2. The balance of the Government's claim covered other matters.

The Government petitioned the District Court for review of the Referee's order. The District Court adopted the Referee's findings of fact and conclusions of law and affirmed the order disallowing the Government's amended claim. The United States appeals from such order.

Before considering the merits of this appeal, we shall discuss the rival contentions of the parties as to the function of the Referee in this type of case and the principles of law which should govern this Court in reviewing the order of the district court. Appellant maintains that the hearing before the Referee was in essence a judicial review of the decision of the Armed Services Board of Appeals and under 41 U.S.C. § 321,[3] the Referee was bound by the decision of such Board unless it could be found that the Board's determination was subject to at least one of the defects set forth in that Section. The appellee maintains that the hearing before the Referee was a *de novo* hearing wherein the Referee could make his independent determination and having done so, that this Court is governed by the "clearing erroneous" rule set forth in Fed.Rules Civ.Proc., 52(a). Appellant maintains that appellee's reliance upon the "clearly erroneous" rule is misplaced and that the test which we must apply is not whether there was evidence to support the district court's order but rather whether there was a substantial showing before the Referee that the determination by the Armed Services Board of Appeals was subject to any of the defects mentioned in said § 321.

■ We deem it unnecessary to resolve these contentions. The facts presented to the Armed Services Board of Appeals are not in conflict in any significant sense. Based upon that record, the Board reached the conclusion that the contract was properly terminated for default on the part of appellee and for anticipatory breach. The Referee, on the same record, reached the opposite conclusion and held that the termination was for the convenience of appellant. In these circumstances, our problem is to determine whether the conclusion of the district court is contrary to law as applied to the undisputed facts. No limitation is placed upon us by either 41 U.S.C. § 321 or Fed.Rules Civ.Proc., 52(a) in respect to passing upon questions of law.

We shall now consider the Government's contention that the contract was properly terminated for the contractor's failure to comply with the terms of the delivery schedule for the month of February 1956. The pertinent provisions of the "default" clause of the contract provide:

"11. Default.

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such

3. *"Limitation on pleading contract-provisions relating to finality; standards of review*

"No provisions of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however*, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. May 11, 1954, c. 199, § 1, 68 Stat. 81."

failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure."

It is to be recalled that by telegram dated March 26, 1956, the contractor was notified that its right to proceed further with the delivery of the balance of 10,858 bombs, under the contract, was terminated in whole for default and that by letter to the contractor, dated March 27, 1956, the acts or omissions constituting the default were as follows:

"(a) Failure to deliver the quantity of Item No. 1 in accordance with the delivery schedule set forth in Supplemental Agreement No. 25, which required delivery to the Government of 8,000 Bombs per month commencing July 1955; and

"(b) Contractor suspended production on or about 13 February 1956, and contractor advised the Government of its inability to continue performance."

■ Since the telegram advised the contractor that "letter follows" and since the acts or omissions of default were not stated in the telegram but were set forth in the letter, it is our view that the two documents must be considered together and constitute but a single notice of termination.

The first act or omission of default stated in the letter is failure to deliver bombs in accordance with the delivery schedule set forth in the contract. Such acts or omissions clearly fall within paragraph (a) (i) of the "Default" clause. Such clause does not provide that the contractor shall be given a period of grace within which to cure such failure as is provided in paragraph (a) (ii) of the "Default" clause in respect to other failures of the contractor.

■ The parties agree that the contract plainly requires that the contractor shall make deliveries of bombs in specific quantities in each of the calendar months specified in the Modification dated May 25, 1955. The Government had the right under paragraph (a) (i) of the "Default" clause to terminate the contract without notice upon failure of the contractor to meet each month's delivery schedule. This fact and other evidence in the record indicate that the parties intended time to be of the essence of the delivery schedule.

There is no dispute that the contractor failed to meet the monthly quota for each month specified except for the month of December, 1955.

From the facts before him, the Referee concluded that the contractor was not in default on March 26th or 27th, 1956, for the reasons: (1) that the contracting officer, when he approved the application of the contractor for Title II relief, did not reserve the legal right to terminate the contract for the February shortage and that such approval waived any right to terminate for any default then existing or which might occur while the application was pending; and (2) that the acceptance by the contracting officer each month from June of 1955 through March of 1956 (except December of 1955) of less than the contractually prescribed number of bombs for each such month, constituted recurring monthly waivers by the Government of its right under the "default" clause to terminate the contract for the failure to deliver the full number of bombs prescribed by the contract.

The crucial question presented to us is whether the Referee properly concluded that appellant waived its rights to terminate the contract under the "Default" clause and, hence, the termination of the contract must be deemed to be for the convenience of the Government.

■ It has often been said that the term "waiver" is a troublesome term in the law. "It is a flexible word, with no definite, and rigid meaning in the law, and, since it may be used in many senses, it is often of equivocal significance. While the term has various meanings dependent upon the context, it is, never-

theless, capable of taking on a very definite meaning from the context in which it appears, and each case must be decided on the facts peculiar to it. As applied to the facts of cases, it is often difficult to determine what cases fall within a given definition and what without; and any satisfactory discussion of the term must consider all of its applications." (Footnotes of cases omitted.) 92 C.J.S. Waiver, p. 1041. See also Williston on Contracts (Rev.Ed.) § 678.

"Waiver" is generally defined as "an intentional relinquishment of a known right." Albert v. Joralemon, 271 F.2d 236, at p. 239 (9th Cir. 1959).

"These definitions are open to criticism for more reasons than one. First, it is likely to be understood as implying that any intentional relinquishment of a known right is necessarily effective. This is, of course, unsound. A contract right or other chose in action, as a rule, can no more be relinquished than created without consideration or a sealed instrument. A release or an accord and satisfaction is the ordinary way by which contractual rights are effectively relinquished.

"That there are some exceptions, however, to the generality of the rule that a seal or consideration is needed in order to extinguish an intangible contractual right cannot be disputed. Especially where the assertion of such a right seems fraudulent after conduct inducing the other party to suppose the right would not be asserted, courts of equity have repeatedly held that the right is lost; but clear analysis requires recognition of the fact that such decisions involve either exceptions to or violations of rules governing the discharge of contracts laid down in many decisions, and embodied in fundamental principles of the common law." (Footnotes of cases omitted). Williston on Contracts (Rev. Ed.) § 678.

A review of many decisions from state and federal courts discloses a lack of uniformity as to what elements are or are not necessary to constitute "waiver." There are many decisions which hold that "waiver" does not require any consideration or any element of estoppel. Other decisions contain statements to the contrary. Other cases hold that there may be a valid waiver of formal as distinguished from substantial rights without consideration and without the elements of estoppel. In Pacific States Corporation v. Hall, 166 F.2d 668 (9th Cir. 1948), this Court, in construing California law, said (at p. 671):

"* * * but it is generally held that where substantial rights are involved, a waiver must be supported by a consideration to be valid. 56 Am.Jur. § 16, p. 117. At any rate, waiver consists of a voluntary and intentional relinquishment of a known right; and to prove a case of implied waiver of a legal right, as appellees here attempt to do, there must be a clear, unequivocal and decisive act of the creditor showing a purpose to abandon or waive the legal right, or acts amounting to an estoppel on his part. 56 Am.Jur. § 17, p. 118; First Nat. Bank v. Maxwell, 123 Cal. 360, 55 P. 980, 69 Am. St.Rep. 64; Johnson v. Kaeser, 196 Cal. 686, 239 P. 324."

There is no question that substantial rights are involved in the instant case. The Government's amended proof of claim in bankruptcy claims the sum of $437,059.00. What amount may be owing to the bankrupt by the Government in the event it be held that the termination was for the convenience of the Government, has not been determined but it may safely be assumed that such amount is likewise substantial.

No contention is made by appellee that the claimed modification of the contract resulting from the implied waivers is based upon consideration. We find in the facts no reliance by the contractor to its detriment on the conduct of the Government upon which the implied waivers are based. The difficulties which assailed the contractor throughout the life of the con-

-tract stemmed from its lack of working capital which the Government sought to relieve by assenting to modifications of the contract, Title II relief, over-extension of progress payments, and other acts of cooperation.

 From our review of the decisions, and assuming without deciding that other elements absent from this case need not be present, we are satisfied that as minimum requirements to constitute an implied waiver of substantial rights, the conduct relied upon must be clear, decisive and unequivocal showing a purpose to waive the legal rights involved before such conduct constitutes a waiver.

In our view, in the context of this case, neither the conduct of the contracting officer in recommending approval of the application of the contractor filed in February of 1956 for Title II relief nor the acceptance by appellant of bombs in March of 1956 which were manufactured prior to the shut-down in the early part of February 1956, can be characterized as clear, decisive and unequivocal conduct showing a purpose to waive the legal rights relied upon by appellant.

We hold, in the circumstances of this case, that the contract was properly terminated by the Government on March 27, 1956 because of the contractor's default and that no conduct on the part of appellant constituted an implied waiver of its rights under the "Default" clause of the contract.

We deem it unnecessary to consider the Government's contention that the contract was validly terminated for anticipatory breach.

Since the contract was validly terminated, it was incumbent upon the Trustee in Bankruptcy either to accept or reject the supplemental agreement dated December 16, 1955 wherein it was agreed that the contractor should furnish to the Government certain technical data, delivery of which was to be made at the time of delivery of the final quantity of bombs. Under the express provisions of the Bankruptcy Act, his failure to assume within the limited 60-day period [11 U.S. C. § 110, sub. b] was a rejection which constituted a breach of the supplemental contract as of the date of the filing of the petition in bankruptcy. 11 U.S.C. § 103, sub. c.

The order appealed from is reversed.