420 F.2d 1119
 John G. GROVES, Trustee of the Estate of Dorado-Pacific
Investment Corporation, a California corporation,
Bankrupt, Appellant,
v.
Glenn F. PRICKETT, Ray G. Montalvo and Frank Lerrigo, James
Thuesen and Eckhart Thompson, partners, associated
in business under the common name and
style of Lerrigo, Thuesen and
Thompson, Appellees.
 No. 23635.
 United States Court of Appeals Ninth Circuit.
 Jan. 7, 1970.
 
 W. A. McGugin (argued), Fresno, Cal., for appellant.
 James T. Caleshu (argued), of Miller, Groezinger, Petitt, Evers & Martin, San Francisco, Cal., William C. Meux, Fresno, Cal., for appellees.
 Before HAMLIN, MERRILL and KILKENNY, Circuit Judges.
 KILKENNY, Circuit Judge:
 
 
 1
 The appellant, Trustee in Bankruptcy for Dorado-Pacific Investment Corporation, a California corporation (Dorado), instituted this proceeding in Bankruptcy Court to determine the existence, nature, amount, extent, and validity of the claims of the parties in certain shares of the common stock of Skywest Public Golf Course, Inc. (Skywest), and in and to a fund then and now in the possession of the Trustee. After an extensive hearing, the Referee held that respondent Prickett and Dorado had violated a provision in Skywest's by-laws granting a right of first refusal to its shareholders and ordered that the stock be retransferred by Prickett to the Trustee in exchange for that part of the consideration paid by Prickett, which is now in the possession of the Trustee. On a petition for review, the District Court found there was substantial evidence in support of the Referee's decision and affirmed the order. This appeal is prosecuted from the District Court Order.
 
 
 2
 Dorado, prior to bankruptcy, engaged in the construction and the operation of golf courses. One of its obligations was an agreement for the construction and management of a golf course on premises owned by Skywest. Dorado, in exchange for the agreement to construct and operate the golf course, received approximately 70% Of Skywest's common stock. Some of the shares were subsequently sold. In September, 1965, Dorado held 1402 shares of this stock. This represented approximately 52% Of the outstanding shares. By that time, Dorado had defaulted on its agreement to complete the golf course in accordance with the lease arrangement with Skywest and another corporation, Airport Investors, Inc. Dorado was then in serious financial difficulties, including a misappropriation by its officers of approximately $50,000.00 of the assets of Skywest. During the same period, Dorado had undertaken to construct the Willow Park Golf Course, which involved Dorado in additional financial problems. The investors in Willow Park, recognizing Dorado's financial difficulties, insisted on a completion bond in the sum of $250,000.00. To obtain the bond, Dorado then entered into an agreement with Argonaut Insurance Company, under which Argonaut would deposit $100,000.00 in cash and be paid a premium of $5,000.00, the money to be advanced by Dorado. To obtain this money, Dorado started negotiations with respondent Prickett for the sale of the 1402 shares of Skywest's common stock.
 
 
 3
 One of the articles of Skywest's by-laws provided that a shareholder who desires to sell or transfer should first give written notice of his intention to do so. The same article provided that the other shareholders of Skywest had a right, for a period of 25 days, to purchase such shares on the same terms and conditions as contained in the written notice. Additionally, the Article[1] declared null and void a transfer where the parties failed to comply with the right of first refusal. Both Dorado and Prickett were aware of the provisions of these by-laws. The officers of Dorado attempted to obtain waivers from the remaining shareholders of Skywest. A number of the shareholders refused to execute waivers unless at least $45,000.00 of the proceeds of the sale be irrevocably dedicated to the completion of the Skywest Golf Course and to repayment of funds improperly diverted from Skywest. The sales price of the stock to Prickett was $170,000.00. The waivers recited that the shareholders were consenting to the sale on the basis of a sales price of $170,000.00, pursuant to the 'escrow instructions attached.' The escrow instructions, which were finally executed by Dorado and Prickett, materially differed from the documents presented to the Skywest shareholders. The shareholders had no knowledge of the fact that the agreement between Prickett and Dorado would be changed or that it was, in fact, changed. The signing of the contract between Prickett and Dorado on September 28, 1965, grew out of a conference on the same day at which Ray G. Montalvo was present. The record is clear that he, as principal agent of Dorado, agreed to advance $20,000.00 of the total sum of $170,000.00. Moreover, it is undisputed that Prickett attached great importance to the fact that this $20,000.00 would be advanced. Prickett forthwith advanced $125,000.00 on the total purchase price of $170,000.00. The balance of $45,000.00 has not been paid. No part of the $125,000.00 was used to complete the golf course, nor to replace the misappropriated funds as required by the executed waivers. Out of the $125,000.00 received by Dorado from Prickett, $105,000.00 was paid to the insurance company to obtain the bond. $100,000.00 of that amount has now been paid by the insurance company to the Trustee. The balance of $20,000.00 never reached the treasury of Dorado.
 
 ISSUES PRESENTED
 
 4
 Summarized, the issues presented on appeal are:
 
 
 5
 (1) Was the shareholders' right of first refusal, as outlined in Article XII of Skywest's by-laws, a reasonable restraint on the transfer of its common stock?
 
 
 6
 (2) Did the Referee commit error in voiding the contract between Dorado and Prickett and in requiring that the stock be transferred to appellant and the $100,000.00 in appellant's possession be returned to Prickett?
 
 
 7
 $1-3 (1) While under California law, a corporate by-law must not place an unreasonably restrictive curtailment on the right of alienation, nor must it otherwise unreasonably deprive a shareholder of substantial rights, Spencer v. Hibernia Bank, 186 Cal.App.2d 702, 736, 737, 9 Cal.Rptr. 867 (1960); Bennett v. Hibernia Bank, 47 Cal.2d 540, 552, 305 P.2d 20 (1956), a by-law reserving a right of first refusal in other shareholders does not unreasonably restrict the right of alienation, nor deprive the shareholder of a substantial right. Vannucci v. Pedrini, 217 Cal. 138, 17 P.2d 706 (1932); Bennett v. Hibernia Bank, supra. For that matter, by-laws restricting a transfer in closed corporations are sometimes essential to a successful enterprise. It has been said that such by-laws are 'necessary for the protection of the corporation and its stockholders against rivals in business or others who might purchase its shares for the purpose of acquiring information, which might thereafter be used against the interests of the company * * *.' Mancini v. Patrizi, 87 Cal.App. 435, 262 P. 375, 376 (1927). A recent California Supreme Court case restating the same rule is Tu-Vu Drive-In Corp. v. Ashkins, 61 Cal.2d 283, 38 Cal.Rptr. 348, 391 P.2d 828 (1964). We find nothing unreasonable in the requirements of the challenged by-law. The parties concede that California law controls the legal issue on the validity of the challenged by-law. In full support is Diamond Nat'l Corp. v. Lee, 333 F.2d 517, 521 (9th Cir. 1964).
 
 
 8
 A valid preference right, such as stated in Article XII, may be specifically enforced by the corporation. To limit a corporation to an action for damages would defeat the very purpose of the contract and would not furnish an adequate remedy. Moreover, if the stock has already been sold, a court of equity will cancel the sale and enforce the preference right to purchase. 12 Fletcher, Cyclopedia of the Law of Private Corporations, 5457.1 (1957 Rev. Vol.). The California courts are in complete harmony with and enforce the same rule. Addiego v. Hill, 238 Cal.App.2d 842, 48 Cal.Rptr. 240 (1965); Addiego v. Hill, 268 Cal.App.2d 280, 73 Cal.Rptr. 901 (1968). The facts in the latter case bear more than a casual resemblance to those before us.
 
 
 9
 (2) The record discloses a clear portrait of a number of corporations interested in golf clubs, all on the verge of insolvency. In this frenzied atmosphere, it is small wonder that the officers of the bankrupt were jumping by plane from place to place in a frantic effort to secure waivers from the minority stockholders, while at the same time giving promises and assurances to Prickett that certain conditions would be met if he would advance forthwith $170,000.00 for the purchase price for the stock. To round out the picture it seems quite clear that Prickett was relying on his attorney Bjorklund, while Bjorklund was relying entirely on attorney Irwin, who apparently was acting for Skywest, Dorado and a few others. Both Prickett and Bjorklund were quite positive of their position, while Irwin seemed to recall very little about the entire transaction.
 
 
 10
 We summarize, in part, the conditions outlined in the escrow instructions: (1) that Prickett, his lawyer Bjorklund, and one Sherman, be elected to the Board of Directors;[2] (2) that a notice of completion and a waiver of lien, in form satisfactory to Prickett's attorney, be executed and delivered showing that there were no liens against the golf course[3] or any of the leasehold properties; (3) a certification as to the precise amount of money owing to Skywest by Baldock-Pacific and/or Bob Baldock and/or Palmer Crow; (4) a requirement that Ray Montalvo, one of the officers of Dorado-Pacific and one of the principal promoters of the transaction, advance $20,000.00 of the total $170,000.00; (5) a requirement that the holders of 724 shares of the capital stock of Skywest waive and quitclaim to Glenn Prickett their rights under an agreement between Skywest and various stockholders, principals, etc. of Bob Baldock, Inc.
 
 
 11
 A partial effort, at least, was made to comply with (1), (2) and (3). Some type of a meeting was actually held by the officers of Skywest and the Minutes indicate that Prickett and others were on a new slate of officers and directors. But no mention is made of any election of Prickett as President or the others as directors. Both Prickett and his attorney deny that they received the notice mentioned in number (2), or the certification in number (3). The $125,000.00 check was made payable to Baldock-Pacific Properties.[4]
 
 
 12
 Of great significance is the fact that Dorado, by filing a Chapter XI[5] Bankruptcy proceeding on October 22, 1965, placed it beyond its own power to comply with any of the specific conditions of the escrow agreement. The Chapter XI proceedings culminated in an adjudication in bankruptcy on February 21, 1966. After the filing of the petition on October 22, 1965, the bankruptcy court had exclusive jurisdiction of the debtor and its property. 11 U.S.C. 711. By the spring of 1966, Skywest was in the hands of note holders on account of Dorado's failure to pay debts.
 
 
 13
 It seems clear that Prickett was not aware of the special conditions attached to the waivers and did not learn of these conditions until after Dorado was in bankruptcy. By that time, he had received an escrow receipt for 1402 shares of the stock. He was never informed that certain of the shareholders of Skywest were demanding that Dorado complete or make provisions for completion of the golf course. Prickett originally would only agree to pay $150,000.00 for the shares and it was not until after he walked out of the meeting that Montalvo said that he had another idea and that he would make up the additional $20,000.00 and to show good faith that he would immediately put $10,000.00 of that amount in escrow. The conditions of the escrow were never fulfilled to the knowledge of Mr. Prickett. Prickett was not acquainted with any of the shareholders of Skywest and did not meet them until the first bankruptcy hearing. When asked why he did not deliver the balance of the $45,000.00, he answered, 'Because the conditions in there had not been complied with.' At the time he delivered the $125,000.00 check to Mr. Irwin, the attorney who was handling many of the matters for both corporations, Prickett did not know if Irwin had the escrow receipt evidencing the 1402 shares. Nor did he know whether Irwin had a certificate from the accountants or from Bob Baldock as to other agreements. The filing of the petition in bankruptcy threw a damper on the whole affair insofar as Prickett was concerned. Prickett testified he didn't know whether he had ever been elected as President. Although Minutes of an alleged special meeting of Skywest Public Golf Course, Inc. would seem to indicate that the old officers resigned and that a new slate of officers were selected, there is nothing to show that there was a stockholders meeting at which new officers were elected, or that Glenn Prickett was ever elected President. Although there is an alleged waiver of a notice of time and place of the special meeting, the only ones out of a total of five that seemed to have signed this were William Flum and Palmer Crow. Of course, this would not be important if the old directors, in fact, attended the meeting and did not object. Prickett was not present at the meeting.
 
 
 14
 Prickett testified that the notice of completion and waiver was never received by him or Mr. Bjorklund, his attorney, nor was the condition (c), the certificate of the accountant, ever received. Mr. Irwin, an attorney, in addition to representing Skywest, Bob Baldock and Dorado, also represented Palmer Crow. Bjorklund, the attorney for Prickett, testified that he relied on Mr. Irwin's assurance and representations that all waivers had been made. Irwin told him that all waivers had been executed and since Irwin was the escrow holder of the stock and the attorney for the corporation, Bjorklund accepted the escrow receipt as evidence that the by-laws of the company had been complied with. He thought that Montalvo represented the other 48% Of the stock in Skywest, Mr. Irwin's client, which was in dire need of funds. Bjorklund challenged the Minutes under which the old officers resigned and asked for an opinion as to whether the election of the individuals was a valid election. In other words, Prickett, through his attorney, challenged the validity of the election. He never received the certificates which would satisfy the conditions. Irwin represented to Prickett that the waivers and consents of the stockholders to the sale had been received. He had no connection whatsoever with the other Skywest stockholders. Irwin's testimony must not have been very satisfactory to the Referee. It is replete with inconsistencies.
 
 
 15
 The $125,000.00 check payable to Baldock was endorsed to Baldock-Pacific by Palmer Crow, President of Dorado, and delivered to Montalvo. The check was endorsed by Crow and Montalvo. Baldock wanted to borrow $8,000.00 of the money. They cashed the check at a bank in San Leandro. Montalvo secured a cashier's check for $105,000.00 and delivered it to the Argonaut Insurance Company. The balance of $20,000.00 was divided into one or more certified checks totaling $8,000.00 and delivered to Baldock, $12,000.00 in cash, all in $20.00 bills, and a $1,000.00 bill was kept by Montalvo.
 
 
 16
 Montalvo was a very slippery witness. His explanation of what happened to the $20,000.00 of the initial payment, over and above the $105,000.00 paid to the insurance company, presents a good example of downright evasion. He said that $8,000.00 of the $20,000.00 was paid to the president of Dorado in a cashier's check and that he took the balance of $12,000.00 in cash, a $1,000.00 bill and the remainder in $20.00 bills. He could give no plausible explanation as to what he did with the $12,000.00. At times, he seemed to claim it was a commission for obtaining the $125,000.00 loan from Prickett, while at other times it would seem he was claiming that he paid the $12,000.00 to himself for different obligations owing to him by the respective corporations. Asked where he got the $10,000.00 to partially comply with his promise to advance $20,000.00 of the total of $170,000.00, he was very evasive. Finally, on cross-examination, it became quite clear that he took the $12,000.00 in cash, deposited it in a bank and then drew a $10,000.00 check and delivered it to attorney Irwin, who then certified that Montalvo had paid $10,000.00 on his $20,000.00 promise. Of course, as the Referee held, Montalvo just took $10,000.00 of the money which had been advanced by Prickett and attempted, in that manner, to partially relieve himself of the $20,000.00 obligation.
 
 
 17
 The record shows that Prickett's attorney on October 26, 1965, notified Irwin of the failure to comply with the conditions above mentioned. Evidently, the attorney, at that time, did not know that Dorado had filed the Chapter XI proceeding on October 22nd. In an analysis of the evidence, we must keep in mind that the creditors of the bankrupt were in no way injured by the actions of Prickett or Skywest. Insofar as the record discloses, those creditors were in precisely the same position on October 22nd, the date of the Chapter XI filing, as they were on September 28th when Prickett advanced the $125,000.00. The Referee was clearly right in holding that this record, Prickett is entitled to a reunder the circumstances presented by turn of the $100,000.00 and is under no obligation to pay the alleged balance of $45,000.00 on an agreement, the conditions of which were never fulfilled.
 
 WAIVER
 
 18
 Appellant urges that Prickett waived the conditions in the escrow agreement. The issue of waiver was one of fact for the Referee and he resolved it against the appellant. Prickett was powerless to act after Dorado filed the bankruptcy proceedings. No sensible person would then go forward and pay the $45,000.00 balance. Neither Prickett nor his attorney, ever had possession of the shares of Skywest stock. In fact, if they were issued they were never delivered to Prickett or his attorney. An escrow receipt would indicate that a certificate was actually issued and placed in escrow with Irwin, the escrow agent. Of course, Prickett could not offer to return the stock if he did not have possession. In expending his own time and money in trying to make Skywest a going concern, Prickett was doing nothing other than what an ordinary prudent business man would do under like circumstances. He was into the venture with $125,000.00 of his money. A substantial sum in any league. In these surroundings, his overall actions did not reach the stature of a waiver. Certainly, the finding of the Referee against appellant on the issue is not clearly erroneous.
 
 
 19
 A waiver is an intentional relinquishment or abandonment of a known right or privilege. Beasley v. Wilson, 370 F.2d 320 (9th Cir. 1966), cert. denied 387 U.S. 913, 87 S.Ct. 1700, 18 L.Ed.2d 634 (1967) (C.A.Cal.); United States v. Chichester, 312 F.2d 275 (9th Cir. 1963) (C.A.Cal.). A waiver can be employed only for defensive purposes. Although it can preclude the assertion of legal rights, it cannot be used to impose legal duties. Rennie & Laughlin, Inc. v. Chrysler Corp., 242 F.2d 208 (9th Cir. 1957) (C.A.Cal.). As minimum requirements to constitute an 'implied waiver' of substantial rights, the conduct relied upon must be clear, decisive and unequivocal of a purpose to waive the legal rights involved. Otherwise, there is no waiver. United States v. Chichester, supra.
 
 
 20
 In a case such as this where there is an obvious conflict in the testimony, we must rely in large measure on the good judgment of the trier of the facts in passing on the credibility of the witnesses. The Referee had the opportunity to see and to hear Montalvo, Bjorklund, Prickett and others. He chose to rely on the testimony of Bjorklund and Prickett, with whom he was greatly impressed. Invading the extremely delicate area of passing on the credibility of the witnesses is not our function. The demeanor of the witnesses, their sincerity and candor is a matter for the Referee. Ashton v. Sentney, 145 F.2d 719 (9th Cir. 1944).
 
 
 21
 Finding no reversible, or other, error, the judgment of the Referee and of the District Court must be, and is, affirmed.
 
 
 
 [1]
 Article XII
 'Any sale or transfer, or purported sale or transfer of the shares of said corporation shall be null and void unless the terms, conditions and provisions of this Article XII are strictly observed and followed.'
 
 
 [2]
 Although not specifically mentioned, it is inherent in the record that the Board referred to was that of Skywest
 
 
 [3]
 Again referring to Skywest
 
 
 [4]
 There is a recitation in the escrow instructions that Baldock-Pacific Properties was 'formerly Dorado-Pacific Investment Inc.', the bankrupt. In any event, the two companies were treated as the same company in the escrow transaction and were represented by the same attorney and the same officers, including the vice-president, Montalvo
 
 
 [5]
 11 U.S.C. 701 et seq